## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

The Families Advocate, LLC, an Arizona )
Limited Liability Corporation, as )
Conservator of D.M., a minor, and Sarina )
Bonno and Julian Moreno, individually, )
                                  )
           Plaintiffs, )              Case No. 3:16-cv-114
                              )
vs.                      )  **REPORT AND RECOMMENDATION**
                              )    **ON MOTIONS FOR PARTIAL**
Sanford Clinic North d/b/a Sanford Clinic )      **SUMMARY JUDGMENT**
Jamestown, Sarah Schatz, M.D., and )
Lutheran Charity Association d/b/a )
Jamestown Regional Medical Center, )
                              )
          Defendants. )

This action alleges medical malpractice surrounding the ▮▮▮▮ 2014 birth of D.M. Plaintiffs are D.M.'s conservator—The Families Advocate, LLC—and D.M.'s parents—Sarina Bonno and Julian Moreno. Defendants are (1) Sarah Schatz, M.D., the attending physician at D.M.'s birth; (2) Sanford Clinic North d/b/a/ Sanford Clinic Jamestown, Dr. Schatz's employer; and (3) Lutheran Charity Association d/b/a Jamestown Regional Medical Center (JRMC), the hospital at which D.M. was born and which employs various healthcare providers involved in the care of D.M. and his mother. Plaintiffs contend D.M. suffered permanent and profound neurological injury as a result of defendants' negligence. Defendants deny all claims of negligence.

The Sanford defendants move for partial summary judgment, alleging (1) all claims of D.M.'s parents—including claims for D.M.'s pre-majority medical expenses—are barred by the applicable statute of limitations and (2) claims seeking damages for D.M.'s siblings are not recognized under North Dakota law. (Doc. 54). JRMC joins in the motion of the Sanford defendants. (Doc. 62).

The parents' claims for damages, as alleged in the complaint, include (1) D.M.'s past and future medical expenses; (2) the parents' past and future lost income, lost support, and lost employment opportunities; and (3) the parents' past and future loss of services and companionship of D.M. (Doc. 1, pp. 10-11). The complaint does not name D.M.'s siblings as parties, but reports of plaintiffs' expert economist include valuation of damages for the siblings' loss of "household/family accompaniment services," (Doc. 56-2, pp. 6-7), and valuation of damages for the siblings' loss of D.M.'s "society or relationship," (Doc. 56-1, p. 5).

Plaintiffs assert genuine issues of material fact concerning when the claims of D.M.'s parents accrued. As to claims of D.M.'s siblings, plaintiffs argue the jury should be permitted to hear the expert testimony regarding the impact of D.M.'s injuries on his entire family, including his siblings, (Doc. 67, pp. 16-17), but concede the siblings are not entitled to any award of damages.

## Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Arena Holdings Charitable, LLC v. Harman Prof'l, Inc., 785 F.3d 292, 293 (8th Cir. 2015) (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When the record as a whole at the time of the motion "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary

judgment is appropriate. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

A party opposing summary judgment "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." <u>Wood v. SatCom Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013) (quoting <u>Wingate v. Gage Cty. Sch. Dist. No. 34</u>, 528 F.3d 1074, 1078-79 (8th Cir. 2008)). Evidence must exist on which the jury could find for the plaintiff. <u>Id.</u> (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)). In ruling on a summary judgment motion, a court must view the facts "in the light most favorable to the non-moving party." <u>Id.</u> (quoting <u>Torgerson</u>, 643 F.3d at 1042). Federal Rule of Civil Procedure 56(c)(1)(A) requires "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" to support factual assertions either for or against a motion for summary judgment.

A statute of limitations in a civil proceeding is an affirmative defense. <u>D.E. v. K.F.</u>, 825 N.W.2d 832, 835 (N.D. 2012). A party relying on the statute of limitations has the burden of proving the action is barred. <u>Id.</u>

## Background

The court's jurisdiction is based on diversity of citizenship, so North Dakota law governs. Under North Dakota Century Code section 28-01-18(3), medical malpractice claims must be commenced within two years after a claim has accrued. The North Dakota Supreme Court has adopted a discovery rule in professional malpractice

claims—holding a claim accrues when a plaintiff is put on notice of a potential claim. Schanilec v. Grand Forks Clinic, Ltd., 599 N.W.2d 253, 255 (N.D. 1999).

Though Federal Rule of Civil Procedure 3 provides that a federal action is commenced by filing a complaint with the court, under the Erie doctrine, state rather than federal rules govern the commencement of a federal diversity action. State commencement rules are considered "part and parcel of the statute of limitations." Larsen v. Mayo Med. Ctr., 218 F.3d 863, 867 (8th Cir. 2000) (quoting Walker v. Armco Steel Corp., 446 U.S. 740, 752 (1980)). North Dakota commencement rules provide that "[a] civil action is commenced by the service of a summons." N.D.R. Civ. Pro. 3.

The docket shows plaintiffs filed the complaint in this court on May 13, 2016, and the clerk issued summonses to all defendants that same day. (Doc. 1; Doc. 4). Plaintiffs initiated the waiver of service process of Federal Rule of Civil Procedure 4(d). The Sanford defendants signed the waivers of service on June 22, 2016, (Doc. 11; Doc. 12), and a JRMC representative signed a waiver of service on June 23, 2016, (Doc. 15). Thus, applying North Dakota's Rule 3, this action was commenced when defendants signed the waivers of service on June 22 and 23, 2016. Plaintiffs do not question the dates of service of the summonses, (Doc. 67, p. 9), and do not challenge that those dates determine commencement of the action.

Defendants assert the claims of D.M.'s parents accrued on the date of his birth—███████ 2014—and assert the statute of limitations on their claims expired on ███████ 2016, some ███████ days before service of the summonses. Plaintiffs contend the parents' claims did not accrue until August 2015, when they first became aware that D.M.'s cerebral palsy could be the result of defendants' negligence. Both sides support

4

their positions with deposition testimony, and plaintiffs also submitted affidavits of D.M.'s parents.

### Affidavit and Deposition Testimony Concerning Notice of Potential Claim

D.M. was transferred via air ambulance from JRMC to Sanford Hospital, Fargo, North Dakota, several hours after his birth and was admitted to Sanford's neonatal intensive care unit (NICU). Defendants contend that Bonno and Moreno knew "all of the facts that would have put a reasonable person on notice" of a potential malpractice claim on that day. (Doc. 74, p. 5). As to Bonno, defendants assert the following facts support their position: (1) her deposition testimony that there "should have been an emergency" because of presence of meconium when her water broke; (2) her deposition admission that she had concerns about her labor because her water was not clear; (3) when Dr. Schatz came in, grabbed D.M. and lifted him up, Bonno saw that he was limp, purple, and not crying; (4) she saw healthcare providers "hand-pumping" D.M. with oxygen while in the delivery room; (5) a Code Blue was called; (6) Bonno and Moreno both had concerns about the labor and delivery after D.M. was delivered and was not breathing; and (7) she knew D.M. had an EEG scan and questionable seizures when he was less than a week old. Id. at 6 (citing to Bonno's deposition testimony). As to meconium staining, the court notes Bonno's deposition testimony that one of the JRMC nurses told her meconium staining was normal. (Doc. 67-3, pp. 68-69, 134). Additionally, Bonno testified someone in the delivery room told her D.M. "was going to be okay." Id. at 74.

Defendants assert Moreno was on notice of a potential malpractice claim based on his deposition testimony that: (1) D.M. was purple, limp, and looked "practically dead," when he was born; (2) he had many concerns about D.M.'s condition

5

immediately after his delivery; (3) he and Bonno discussed their concerns about the labor and delivery at the time, including why D.M. had not been breathing; (4) while D.M. was still in the delivery room, Moreno was told D.M. had to be "on a machine," would be transferred to Sanford via helicopter, and would be admitted to the infant intensive care unit; (5) Moreno went to Sanford in Fargo immediately and had discussions with Sanford doctors and nurses about D.M. not breathing and the machine they would put him on; (6) a Sanford doctor told him that an MRI showed "some damage"; and (7) he was told the cause of D.M.'s problems was "loss of air." (Doc. 74, pp. 6-7) (citing Moreno deposition testimony).

Plaintiffs identify other deposition testimony as demonstrating genuine issues of material fact. Both Bonno and Moreno testified that no health care providers had ever told them any of the defendants did anything wrong. (Doc. 67-3, pp. 109, 171; Doc. 67-4, p. 26). Bonno testified she returned to JRMC with D.M. after his discharge from Sanford, thanked the nurses who had provided care during labor and delivery, and took photos of D.M. with the JRMC nurses. (Doc. 67-3, pp. 142-43). Her testimony in that regard was corroborated by deposition testimony of a JRMC nurse, who recalled the event to have occurred when D.M. was approximately eight weeks old and the family was planning to move from North Dakota to Arizona. (Doc. 67-5, p. 140).

In their affidavits, Bonno and Moreno stated they first knew that D.M.'s injuries could be the result of medical negligence after Bonno saw an August 2015 television commercial for their counsel's law firm. Bonno's affidavit testimony is that after seeing the commercial, which described birth injuries causing cerebral palsy, she called the phone number given on the commercial on August 26 or 27, 2015, and first learned

D.M.'s injuries could be the result of medical negligence in a subsequent phone conversation with attorney Lisa B. Weinstein. Moreno's affidavit states that the first discussion he and Bonno had about D.M.'s injuries possibly resulting from defendants' negligence was sometime after Bonno's call with the law firm. (Doc. 67-1; Doc. 67-2). Both Bonno and Moreno testified that, prior to August 2015, no medical professional had ever told them that D.M.'s injuries were the result of medical negligence. (Doc. 67-3, pp. 109, 171; Doc. 67-4, p. 26). Bonno and Moreno assert neither of them had any knowledge that D.M.'s medical conditions might have resulted from negligence during the labor and delivery prior to Bonno's conversation with attorney Weinstein.

### Law and Discussion

North Dakota Century Code section 28-01-18 provides:

The following actions must be commenced within two years after the claim for relief has accrued:

. . . .

3. An action for the recovery of damages resulting from malpractice; provided, however, that the limitation of an action against a physician or licensed hospital will not be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery thereof unless discovery was prevented by the fraudulent conduct of the physician or licensed hospital. This limitation is subject to the provisions of section 28-01-25.[1]

The statute itself is silent on when a medical malpractice action accrues. The North Dakota Supreme Court has held an action accrues "when the plaintiff knows, or with reasonable diligence should know, of (1) the injury, (2) its cause, and (3) the defendant's

---

[1] North Dakota Century Code section 28-01-25 extends the statute of limitations for claims of persons who are under the age of eighteen years at the time the action accrues. In professional malpractice cases, that extension is limited to twelve years.

possible negligence." <u>Schanilec</u>, 599 N.W.2d at 255. Further, the court has stated that

knowledge is "an objective standard which focuses upon whether the plaintiff has been

apprised of facts which would place a reasonable person on notice that a potential claim

exists." <u>Zettel v. Licht</u>, 518 N.W.2d 214, 215 (N.D. 1994). To have the requisite

knowledge, a plaintiff need not be "subjectively convinced" that an injury was caused by

a defendant's negligence. <u>Long v. Jaszczak</u>, 688 N.W.2d 173, 176 (N.D. 2004). The state

supreme court has also held that when a malpractice plaintiff "knows or with reasonable

diligence should know" is typically a question of fact inappropriate for summary

judgment, unless reasonable minds can draw but one conclusion. <u>Froysland v.

Altenberg</u>, 439 N.W.2d 797, 799 (N.D. 1989).

Though D.M.'s claims were tolled for twelve years because of his minority, North

Dakota's statutory tolling of a statute of limitations during minority does not apply to

the parents' claims. <u>B.D.H. ex rel. S.K.L. v. Mickelson</u>, 792 N.W2d 169, 173 (N.D. 2010).

In <u>B.D.H.</u>, the court held that North Dakota law did not permit a "wrongful life" claim

against physicians who had not diagnosed a chromosomal abnormality during

pregnancy and further held that North Dakota Century Code section 28-01-25, the

tolling statute, did not apply to the parents' asserted wrongful birth claim. <u>Besette v.

Enderlin School District</u>, which extended the time for a minor's claim under North

Dakota's political subdivision liability law, held the tolling statute did not operate to

extend the time for the minor's father to file a claim. 288 N.W.2d 67, 75 (N.D. 1980).

Although their claims for loss of parental consortium derive from D.M.'s injury, those

claims are distinct from D.M.'s claims. <u>Sime v. Tvenge Assocs. Architects & Planners,

P.C.</u>, 488 N.W.2d 606, 610 (N.D. 1992).

Plaintiffs do not assert the case was commenced before June 22 and 23, 2016. Nor do plaintiffs assert the parents' claims are subject to the tolling statute. Their opposition to the motion is based solely on an asserted factual dispute as to when the parents' claims accrued.

## 1.    Cases Interpreting North Dakota Century Code Section 28-01-18

The North Dakota Supreme Court has not addressed accrual of a birth injury malpractice claim but has decided several cases discussing when a plaintiff is considered to have the requisite knowledge of a potential medical malpractice claim in other factual contexts. The state supreme court first adopted the discovery rule in Iverson v. Lancaster, 158 N.W.2d 507 (N.D. 1968). There, the plaintiff alleged the cause of her hypertension had not been properly diagnosed. She had been advised that, because of the hypertension, she should not become pregnant and should have a tuboligation. She had that surgery in 1959. In 1962, the cause of her hypertension was properly diagnosed and surgically corrected. The court held the claim had not accrued until she learned the actual cause of her hypertension. Id. at 512.

Anderson v. Shook involved a plaintiff who in 1975 had received radiation therapy to treat uterine cancer. 333 N.W.2d 708 (N.D. 1983). In 1981, she commenced an action alleging the therapy had been negligently provided, asserting she had not discovered the physician's possible negligence until 1980. Reversing the trial court's grant of summary judgment for the defendants, the North Dakota Supreme Court stated there was a genuine issue of material fact "concerning the knowledge Anderson had, or in the exercise of reasonable diligence should have had, regarding Dr. Shook's alleged negligence." Id. at 710. The court stated, "Unless the 'physician's activity constitutes a

blunder so egregious that a layman is capable of comprehending its enormity,' the injustice of barring a plaintiff's claim before she reasonably could be aware of it is obvious." Id. at 712 (quoting Winkjer v. Herr, 277 N.W.2d 579, 585 (N.D. 1979)).

Following his 1983 open heart surgery, the plaintiff in Froysland experienced pain and numbness in his right arm and hand resulting from compression of the ulnar nerve during surgery. 439 N.W.2d at 797. His surgeon had advised him of that possible complication prior to surgery but had told him those symptoms usually resolved within a couple of months. The plaintiff's symptoms persisted, leading to a 1985 surgery on his right arm. In 1986, he commenced an action against the surgeon who performed the open heart surgery in 1983; that claim was dismissed as barred by the statute of limitations. Also in 1986, he commenced a claim against the anesthesiologist involved in his 1983 surgery, asserting he had not known the anesthesiologist was responsible for padding and protecting his arm during surgery until his attorney discussed his case with a medical consultant. The court held that the plaintiff knew his arm injury was related to his heart surgery by early September 1984 when he requested financial assistance from the hospital at which the surgery had been performed. "At that point, he knew of the injury, of its cause, and of the possible negligence; he had only to identify all who were involved in the operation. He had ample time to do so within two years thereafter." Id. at 798. The plaintiff further argued that a continuous treatment rule should toll the statute of limitations against the anesthesiologist, who had been involved in both his heart surgery and his arm surgery. The North Dakota Supreme Court decreed that, if it were to adopt a continuous treatment rule, it would not have applied in those circumstances

because the alleged act of negligence during the heart surgery was an event distinct from the arm surgery. Id. at 801.

Wheeler v. Schmid Laboratories, Inc. included a medical malpractice claim against a physician who had implanted, and later removed, the plaintiff's intrauterine contraceptive device. 451 N.W.2d 133 (N.D. 1990). When he removed the IUD, the physician noted an ovarian cyst and advised the plaintiff it might need to be removed. She consented to exploratory surgery, with possible removal of the cyst. During a 1974 surgery, the physician removed both the plaintiff's ovaries, both her fallopian tubes, and her uterus. In 1986, the plaintiff commenced an action against the physician and the IUD manufacturer, apparently alleging that the physician had not properly diagnosed an ectopic pregnancy, that the extensive surgery had not been necessary, and that the physician had fraudulently concealed his negligence. The North Dakota Supreme Court affirmed summary judgment for the physician, stating the plaintiff knew of or should have known of the potential claim at the time of the surgery. Id. at 137.

The Zettel plaintiff had a radiological procedure, in which contrast medium was injected into a vein in his foot. 518 N.W.2d at 215. The contrast medium extravasated into surrounding tissue, ultimately leading to amputation of a toe. Although he commenced a claim against the radiologist within two years of the occurrence, the plaintiff made no claim against the medical technologist—a person employed by a different entity than the radiologist—who assisted during the procedure. The plaintiff had been told of the extravasation immediately following the procedure, he knew that a technician had assisted during the procedure, and he was aware that extravasation could result from improper needle placement or careless movement causing the needle to pull

loose during the procedure. The court held his knowledge was sufficient to put a reasonable person on notice that the technician or anyone else directly involved in the procedure could possibly have acted negligently. Because he had not commenced a claim against the technician within two years of the procedure, the North Dakota Supreme Court affirmed summary judgment for the technician and the technician's employer. Id. at 216.

In Schanilec, the plaintiff alleged negligence in misdiagnosis of a vertebral fracture as a muscular problem rather than a skeletal problem. 599 N.W.2d at 254. The plaintiff had been in a vehicular crash in 1981, and from that time until February 1994, the defendant diagnosed and treated him for a muscular condition—fibrositis. The plaintiff learned in February 1994 that he had actually sustained a skeletal injury—a compression fracture in the lumbar spine. He asserted he was not apprised of facts putting him on notice that accelerated collapse of his vertebral discs between 1981 and 1994 was possibly caused by the physician's negligent misdiagnosis until later in 1994, after a discogram and lumbar fusion. The court held his claim accrued in February 1994 when he learned his back problems were skeletal rather than muscular, and learned the earlier diagnosis was likely wrong and perhaps negligent. Id. at 258.

Long involved a patient who experienced an allergic reaction to contrast media injected during a radiological procedure. 688 N.W.2d at 175. The patient went into anaphylactic shock, never regained consciousness, and died two weeks later. The patient's spouse arrived at the hospital shortly after the patient went into shock. In those circumstances, the state supreme court held that reasonable minds could come to but one conclusion—the patient's spouse was apprised of the facts that would place a

reasonable person on notice of a potential medical malpractice claim on the date the patient had the radiological procedure and went into shock. Id. at 176.

A recent case in this district, Klade v. Altru Health System, addressed accrual of a medical malpractice claim under North Dakota law. D.N.D. Case No. 2:15-cv-72, Doc. 33 (July 29, 2016 Order denying Motion for Summary Judgment), reconsideration denied, Doc. 37 (Aug. 31, 2016 Order).[2] On December 11, 2012, Robert Klade underwent surgery to repair an abdominal aortic aneurysm. Because of signs of post-operative internal bleeding, he underwent an exploratory surgery later that day and another exploratory surgery the following day. The surgeon identified no apparent source of internal bleeding during either exploratory procedure and attributed the bleeding to coagulopathy-related problems. Klade had two additional surgeries in the following weeks. He remained hospitalized and, because of signs of seizure, had an EEG on January 3, 2013, and a neurological evaluation on January 7, 2013. The neurologist noted he had likely suffered a hypoxic ischemic brain injury secondary to hypotension while on a ventilator and could have sustained a stroke. Klade remained sedated and mostly non-communicative until January 15, 2013. On January 18, 2013, he told his wife he could not see, and medical providers determined he had also lost most of his hearing. On February 15, 2013, an ophthalmologist told Klade his optic nerves were dead and he would never see again but gave no explanation of the cause of the optic nerve damage. On February 22, 2013, Klade discontinued follow-up care with the surgeon. The malpractice action was commenced

---

[2] A federal district court's interpretation of North Dakota law is not binding on North Dakota courts, but the North Dakota Supreme Court will "respect a federal district court opinion if it is persuasive and based upon sound reasoning." Scheer v. Altru Health Sys., 734 N.W.2d 778, 783 (N.D. 2007).

on July 23, 2015, alleging the vision loss and hearing loss resulted from post-operative internal bleeding that resulted in prolonged hypotension. Id. at 1-3.

In resisting a motion for summary judgment based on statute of limitations grounds, the plaintiffs—Robert Klade and his wife—asserted none of Klade's medical providers suggested the post-operative problems were anything but a foreseeable complication and none of the medical providers did anything to put them on notice of a potential malpractice claim. Id. at 3-4. The defendant argued the plaintiffs were on notice of a potential claim as soon as they learned of Klade's vision and hearing loss, contending any reasonable layperson should have been able to conclude a nexus existed between the surgeries and the vision loss. The district judge rejected that assertion, noting that the treating ophthalmologist did not observe a nexus or advise the plaintiffs of it. Nor was Klade's decision to discontinue follow-up care with the surgeon sufficient to establish notice. The district judge stated, "Knowing an injury exists is not the same as knowing the cause of the injury or whether the cause is likely the result of malpractice." Id. at 7.

**2.    Birth Injury Cases From Other Jurisdictions Applying Discovery Rule**

North Dakota's discovery rule is similar to those of several other jurisdictions, though most other jurisdictions apparently do not specifically include the "defendant's possible negligence" as a necessary element of claim accrual.

In Florida "the statute of limitations in a malpractice suit commences either when the plaintiff has notice of the negligent act giving rise to the cause of action or when the plaintiff has notice of the physical injury which is the consequence of the negligent act." Allen v. Orlando Reg'l Med. Ctr., 606 So.2d 665, 666-67 (Fla. Dist. Ct. App. 1992). In Allen, parents alleged the defendant health care providers failed to properly monitor fetal

14

well-being during the delivery of a premature infant, the infant had been improperly intubated for forty-five minutes after his birth, and the improper intubation resulted in high blood concentrations of carbon dioxide, which may have caused a brain hemorrhage and cerebral palsy. At birth, the initial impression was that the infant was suffering from perinatal asphyxia, pneumonia, and hypovolemia. The complaint alleged the child "showed evidence of cerebral palsy and demonstrated psychomotor retardation with dysplegia, blindness and marked spasticity," though it is not clear when those conditions were evident. Id. at 666. The plaintiffs alleged the defendant health care providers told the mother that the infant's injuries were the result of his premature birth. The court stated the alleged injuries did not appear to "speak for themselves" or suggest they were the "result of anything other than natural consequences of a recognized medical treatment competently performed." Id. at 667. The court found two genuine issues of material fact precluded summary judgment on the statute of limitations issue: (1) whether the mother should have known at birth that the infant's injuries were caused by negligence, and (2) whether the defendant health care providers knew, or should have known through efficient diagnosis, of physical injuries to the infant after his birth but failed to inform the mother, and "thereby kept her in ignorance." Id. at 669.

In West Virginia, a state statute required an incompetent plaintiff to bring a tort claim within twenty years of its accrual. In Donely v. Bracken, the plaintiffs, who brought claims on behalf of their incompetent daughter and derivative claims more than twenty years after their daughter's birth, argued that the statute denies an incompetent plaintiff the benefit of the "discovery rule." 452 S.E.2d 699, 705-06 (W. Va. 1994). The plaintiffs' daughter was born in the breech position and, shortly after her birth, the parents were

informed that she was deprived of oxygen during delivery, suffered brain damage, and developed cerebral palsy. Both parents testified that they immediately suspected the doctor was negligent but did not contact counsel until after another woman who had filed a lawsuit after her son sustained birth injuries suggested that they do so. The court found the discovery rule inapplicable because the "parents believed 'from day one' that [their daughter's] injury was the result of the physician's negligence" and stated:

> Mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations; the "discovery rule" applies only when there is a strong showing by the plaintiff that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.

Id. at 704 (citation omitted).

Under Pennsylvania's discovery rule, "the statute of limitations will not begin to run until the plaintiff has discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury." Larthey ex rel. Larthey v. Bland, 532 A.2d 456, 458 (Pa. Super. Ct. 1987) (citation omitted). In Larthey, complications arose during a delivery when an infant's shoulder's became impacted in the birth canal, resulting in a brachial plexus injury and a diagnosis of Erb's Palsy. The child's father admitted the doctor had informed him twenty minutes after the delivery that there was a possibility the child's clavicle may have been broken when he rotated the child. A pediatrician informed the parents later that day of the Erb's Palsy diagnosis. Though the mother did not know the cause of Erb's Palsy, she testified that she believed it had come from the delivery. About five weeks after the child's birth and one month after his discharge from the hospital, the child suffered a seizure and a neurologist informed the parents that the child had a brachial plexus injury, was suffering from Erb's Palsy, and the seizure was

due to birth trauma. The court held the parents reasonably should have known the child's injury was caused by the delivery when the child was examined by the neurologist. Id. at 461.

Medical malpractice claims under the Federal Tort Claims Act accrue when a "plaintiff actually knew, or in the exercise of reasonable diligence should have known, the cause and existence of [the] injury." Motley v. United States, 295 F.3d 820, 822 (8th Cir. 2002) (citation omitted). Unlike North Dakota's rule, however, the FTCA does not require knowledge that an injury may have resulted from negligence for a claim to accrue. United States v. Kubrick, 444 U.S. 111, 123 (1979). In T.L. ex rel. Ingram v. United States, the court affirmed dismissal of a birth injury FTCA claim on statute of limitations grounds. 443 F.3d 956, 962 (8th Cir. 2006). The mother asserted the claim did not accrue until she was aware of the cause of her daughter's cerebral palsy. In dismissing the claim, the trial court noted the mother had retained an attorney before the child was discharged from the hospital, the attorney's office had arranged for photographs of the child while still hospitalized, and the attorney requested medical records within three months of the birth. The Eighth Circuit concluded the evidence indicated the mother knew of and was investigating the cause and existence of her child's injury shortly after his birth. Id. at 963.

Jastremski v. United States involved a child born at a military hospital at which his father practiced as a pediatrician. 737 F.2d 666 (7th Cir. 1984). The child experienced seizures soon after birth, but neurological testing soon after hospital discharge was negative. The child developed an abnormal gait by age two, and the parents pursued orthopedic treatment. The parents both testified they did not suspect brain damage until

a neurologist diagnosed cerebral palsy when the child was age four and did not link his problems walking with a neurological injury prior to the neurologist's diagnosis. The trial court found the parents had exercised reasonable diligence, the claim had not accrued until cerebral palsy was diagnosed, and the injury was caused by negligence of personnel at the military hospital. In affirming the trial court's award, the appellate court "refused to impute" to the physician-father knowledge of the child's brain injury and the injury having probably been caused by negligence. Id. at 670.

The birth injury alleged in Gordon v. United States also occurred at a military hospital. 967 F.2d 586 (9th Cir. 1992) (unpublished). In reversing an award for the plaintiff, the appellate court noted the child's parents were aware shortly after his birth that their child had breathing problems caused by meconium aspiration and were aware that his developmental delay resulted from "stress at birth" within the first year after his birth. Id.

Bohrer v. City Hospital, Inc. also involved a birth injury claim under the FTCA. The mother's previous child was delivered by caesarean section, but she was advised she could deliver her second child vaginally. 681 F. Supp. 2d 657, 665-66 (N.D.W. Va. 2010) She experienced complications after labor was induced, and physicians did an emergency caesarean section, which revealed a uterine rupture. The court found that the mother had been aware the uterine rupture resulted in her child being deprived of oxygen and that, when the child's developmental delays became apparent, she was placed on inquiry notice as to whether the injury had resulted from negligence. Id. at 672.

In Rice ex rel. Rice v. United States, the court found that, under the FTCA, the statute of limitations did not begin to run when a child suffered serious birth injuries

from meconium aspiration because "the facts surrounding the injur[ies]" did not "rise to a clear inference that the injur[ies] could be traced to the treatment provided." 889 F. Supp. 1466, 1470 (N.D. Okla. 1995). The court found that even if the child's mother was told the child's problems were caused by meconium aspiration, the mother could have believed the injury was unavoidable. The court stated that knowing that meconium aspiration caused the breathing disorder is not the same as "linking the injury to treatment." Id. at 1472.

### 3.    Application of Case Law to Record Evidence

Plaintiffs argue that as young, first-time parents with limited education and no medical training, they cannot be considered to meet the "should have known" requirement for claim accrual under the facts in evidence. (Doc. 67, pp. 10-11). But defendants argue those factors are irrelevant. (Doc. 74, p. 2). Indeed, the North Dakota Supreme Court has repeatedly described the standard for claim accrual as objective rather than subjective. Wheeler, 451 N.W.2d at 137; Long, 688 N.W.2d at 173.

JRMC argues plaintiffs seek an interpretation that would render section 28-01-18 meaningless—that a claim accrues only when a plaintiff has a "clear understanding and determination" of the cause of an injury or an admission of some liability. (Doc. 76, p. 3). This court does not interpret plaintiffs' argument as being as extreme as JRMC suggests.

There is no evidence in the record suggesting when Bonno and Moreno first learned of D.M.'s cerebral palsy diagnosis. There is no question they were told of his "questionable seizures" while D.M. was hospitalized at Sanford, and Moreno testified Sanford doctors told him an MRI showed "some damages done," but it is not clear when that conversation occurred. (Doc. 67-4, pp. 39-40). Moreno further testified an Arizona

doctor advised them D.M. had brain damage, and it appears that occurred when D.M. was about four months old. Id. at 45-47. The only medical record in evidence shows D.M. was discharged from Sanford on June 21, 2014, and that his admission diagnoses included respiratory failure, meconium aspiration syndrome, persistent pulmonary hypertension in newborn, and hypoxic-ischemic encephalopathy. (Doc. 76-1, pp. 2-3). That medical record makes no mention of what Sanford physicians may have told Bonno and Moreno about the cause of any of those conditions.

As the North Dakota Supreme Court has repeatedly stated, a malpractice plaintiff's knowledge is typically a fact question inappropriate for summary judgment. A reasonable juror could consider the evidence now before the court and conclude that on the day of D.M.'s birth, Bonno and Moreno knew D.M. required resuscitation and had some injury. But in this court's opinion there are genuine issues of material fact about when Bonno and Moreno learned the cause of D.M.'s injury and of defendants' possible negligence. Defendants seem to advocate a position that would require parents to investigate a potential medical malpractice claim any time a newborn requires resuscitation or NICU admission. This court recommends the motion for partial summary judgment on the parents' claims for loss of consortium and their personal loss of income and support be denied.

### 4.    Claims for D.M.'s Pre-Majority Medical Expenses

If, however, the district judge decides that accrual of the parents' claims does not present genuine issues of material fact, it will be necessary to consider plaintiffs' assertion that claims for D.M.'s pre-majority medical expenses are not consequently time barred. Defendants contend that, because parents have a statutory duty to support their

children, all claims for D.M.'s medical care until he reaches age eighteen belong

exclusively to Bonno and Moreno. The statute on which they rely states, "Parents shall

give their children support and education suitable to the child's circumstances. The court

may compel either or both of the parents to provide for the support of their children."

N.D. Cent. Code § 14-09-08.

Under the common law rule, followed in a majority of states, the right to recover

medical expenses of an injured minor is vested exclusively in the minor's parents. 32

A.L.R.2d 1060, 1069; Restatement (Second) of Torts § 703 (1976). A frequently-cited

Maryland case discusses the underlying rationale for the common law rule, as well as

generally recognized exceptions to the rule:

> The rule vesting in the parent the right to recover medical expenses is
> grounded in the proposition that the parent has a duty to care for the child,
> and that as a result of that duty, the parent, not the child, is contractually
> liable for medical expenses incurred on the child's behalf. See 4 J.G.
> Sutherland, Law of Damages, § 1250, at 4737-38 (4th ed. 1916) (a minor living
> with his parents cannot recover medical expenses as items of damages because
> the child is not liable for them, unless the minor has paid the bill, or is legally
> bound to pay it); 2 Arthur G. Sedgwick, Measure of Damages § 486b, at
> 932–33 (9th ed. 1912) ("Since the parent is obliged to support the child during
> minority, and therefore to furnish medical attendance, the minor cannot
> recover medical expenses resulting from the injury, unless, as may happen, the
> minor's estate has become responsible for them."). Thus, if a minor is
> contractually liable for medical expenses, it follows that the minor should be
> able to recover those expenses from a tortfeasor. Other jurisdictions have
> examined this question. Moses v. Akers, 203 Va. 130, 122 S.E.2d 864 (1961),
> set forth four circumstances which constitute exceptions to the general rule
> that parents possess the exclusive right to recover a minor's pre-majority
> medical expenses. These include the following: (1) when the minor child has
> paid or agreed to pay the expenses, (2) when the minor child is legally
> responsible for payment, such as by reason of emancipation, or the death or
> incompetency of his parents, (3) when the parents have waived or assigned
> their right of recovery in favor of the minor child, or (4) when recovery of
> expenses is permitted by statute. Moses v. Akers at 132, 122 S.E.2d at 866
> (citing 43 C.J.S. Infants § 104(d); Tellier, Annotation, supra, 32 A.L.R.2d
> 1060). We believe this reasoning is sound.

Garay v. Overholtzer, 631 A.2d 429, 442-43 (Md. 1993). Under the majority rule, a parent's claim for a child's pre-majority medical expenses is not tolled during infancy. Id. at 439.[3]

The North Dakota Supreme Court has not addressed whether claims for a child's pre-majority medical expenses are exclusively claims of the parents, or claims of the child, or of both the parents and the child. Defendants cite three North Dakota Supreme Court cases in support of their position, none of which directly address the instant issue. Defendants advocate application of the common law rule, but not of the exceptions to the rule recognized in other jurisdictions.

Defendants cite M.M. v. Fargo Public School District No. 1, 815 N.W.2d 273 (N.D. 2012), as holding that a parent's claim for pre-majority medical expenses is considered part of the parental duty of support. (Doc. 56, p. 8). M.M., however, addressed facts quite different from those of this case. There, a middle school student and his father brought a claim for personal injuries the student suffered "while practicing a bike stunt in the school auditorium in preparation for '60s Day, part of the curriculum for [the defendant teacher's] history class." 815 N.W.2d at 274. A jury awarded $285,000 in economic damages for the student's pre-majority medical expenses but attributed 70 percent fault

---

[3] The court notes Sanford cites an Eighth Circuit case as holding a parent's claim for a child's pre-majority medical expenses is not tolled during the child's minority. (Doc. 56, p. 11). The district court reached that conclusion, Bergstreser v. Mitchell, 448 F. Supp. 10, 15 (E.D. Mo. 1977), and the plaintiffs did not appeal dismissal of the parents' claims, Bergstreser v. Mitchell, 577 F.2d 22, 24 (8th Cir. 1978). Thus, the circuit court did not address the issue. The court further notes that the Supreme Court of Missouri has since ruled that an action to recover pre-majority medical expenses is "vested jointly in the child and the parents," although double recovery is not allowed. Boley v. Knowles, 905 S.W.2d 86, 88-90 (Mo. 1955).

to the student. Under North Dakota comparative fault law, the student recovered no damages. The father argued he was nevertheless entitled to a judgment of 30 percent of the $285,000, because the jury attributed 30 percent of the fault to the defendants and because section 14-09-08 required him to pay his son's medical expenses. The court held that a parent is not entitled to recover medical expenses paid on behalf of an injured minor child whose comparative fault exceeds the fault of the tortfeasor. Id. at 280. In reaching its decision, the M.M. court referred to the well-established principle that a parent's claims for medical expenses paid on behalf of an injured child are derivative of the claim of the injured child, but did not discuss whether claims of pre-majority medical expenses belong exclusively to the parents. Id. at 276.

The second North Dakota Supreme Court case which defendants cite is a child custody decision. In that case, the court quoted a portion of the trial court's decision referring to medical expenses when discussing disposition of the parents to provide the child with "food, clothing, and the like." McDowell v. McDowell, 670 N.W.2d 876, 880 (N.D. 2003). Though M.M. and McDowell support defendants' assertion that medical expenses are included in the parents' statutory duty of support, neither case compels the conclusion that claims for D.M.'s pre-majority medical expenses belong solely to his parents.

Defendants cite a third North Dakota case, Milde v. Leigh, 28 N.W.2d 530 (N.D. 1947), though that case did not involve injury to a child. In Milde, the court analyzed an action to recover for a spouse's medical expenses and cited Restatement of Torts comments concerning a tortfeasor's liability to parents of an injured minor for the minor's medical expenses as a "somewhat analogous" action. Id. at 535.

Plaintiffs cite a North Dakota state district court case concluding that, at least where the injured child's medical expenses were paid by Medicaid, "there is no persuasive reason to retain the common law rule that a claim to recover medical expenses incurred during an injured child's minority belongs solely to his or her parents." <u>Balzum v. Holm</u>, No. 09-08-C-02704, 2009 WL 7781425 (Cass County, N.D., Apr. 15, 2009) (filed at Doc. 67-6). Like the injured child in <u>Balzum</u>, D.M. is a Medicaid beneficiary. (Doc. 67, p. 8).

The <u>Balzum</u> court cited to a decision in this district which denied partial summary judgment on claims for pre-majority medical expenses of an injured child. In <u>Eberts v. Kawasaki Motors Corp.</u>, No. A1-02-43, 2004 WL 513792, at *1 (D.N.D. Mar. 15, 2004), the district judge concluded a claim for a child's pre-majority medical expenses did not belong exclusively to the child's parents. The district judge analyzed the issue under the common law rule but found two exceptions to the common law rule were applicable—payment of the expenses by the child and waiver of the parents' claim. As to the first exception, the child was an insured under a health insurance policy purchased by his parents, and the court found the health insurer's payment to be a payment by the child for purposes of the exception to the common law rule. As to waiver, the court found the parents waived their claim by not filing their own claim prior to expiration of the statute of limitations. Sanford argues that the court in <u>Eberts</u> relied on a legal fiction to conclude that payments by the health insurer constituted payments by the minor for purposes of the exception. (Doc. 74, p. 9).

Both the state trial court in <u>Balzum</u> and the federal district court in <u>Eberts</u> based their decisions on the common law rule—and exceptions to it—as discussed in <u>Garay</u>. The

North Dakota Supreme Court generally follows accepted common law rules.[4]

Jurisdictions that have adopted the common law rule have generally recognized the four

exceptions described in <u>Garay</u>, and defendants have not shown the North Dakota

Supreme Court is unlikely to do the same.[5]

Plaintiffs assert that D.M. is a Medicaid beneficiary and that Medicaid payments

on D.M.'s behalf constitute a payment by D.M. under the first exception described in

<u>Garay</u>. Defendants do not dispute that D.M. is a Medicaid beneficiary but assert that

<u>Balzum</u> is the only cited case supporting an exception to the common law rule based on

---

[4] In <u>Vogel v. Marathon Oil Co.</u>, the North Dakota Supreme Court described the importance of common law:

> The law of this state is expressed by various sources, including statutes and common law. N.D.C.C. § 1-01-03. This Court has said, "The common law is therefore adopted by statute as the basic law applicable to civil rights and remedies not defined by the statute. Where there is no express constitutional or statutory declaration upon the subject the common law is applied." <u>Tarpo v. Bowman Pub. Sch. Dist. No. 1</u>, 232 N.W.2d 67, 70 (N.D. 1975) (quoting <u>McLaughlin Oil Co. v. First State Bank of Buffalo</u>, 79 N.D. 525, 57 N.W.2d 860, 864 (1953)) (citations omitted). "In this state there is no common law in any case in which the law is declared by the code." N.D.C.C. § 1-01-06. In construing N.D.C.C. § 1-01-06, this Court has said statutory enactments take precedence over and govern conflicting common law doctrines. <u>Finstad v. Ransom-Sargent Water Users, Inc.</u>, 2014 ND 146, ¶ 12, 849 N.W.2d 165; <u>Vandall v. Trinity Hosp.</u>, 2004 ND 47, ¶ 14, 676 N.W.2d 88. "[I]f a particular statute is so designed that it covers the entire field to which it relates, it does so to the exclusion of the common law." <u>In re White</u>, 69 N.D. 61, 284 N.W. 357, 358 (1939). However, we have also said the common law remains relevant when there is no conflict between the statutory and common law. <u>Rassier v. Houim</u>, 488 N.W.2d 635, 636 (N.D. 1992).

879 N.W. 2d 471, 482 (N.D. 2016).

[5] Sanford argues that, even if this court were to determine the North Dakota Supreme Court would adopt the exceptions to the common law rule, those exceptions are to be applied only in "exceptional circumstances." (Doc. 74, p. 8). The exceptions described in <u>Garay</u> are, by definition, to be applied only in exceptional circumstances.

payments by Medicaid. Further, defendants assert <u>Balzum</u>, as a state trial court decision, cannot be considered to define North Dakota law.[6]

Even though not treated as defining North Dakota law, the court considers <u>Balzum</u> because it is a thorough and well-reasoned decision on facts very similar to those of this case. <u>Balzum</u> was also a medical malpractice case alleging negligence during labor and delivery, where the defendants asserted a parent's claim was barred by the statute of limitations, and where medical expenses of the child were paid by Medicaid. In addition to its discussion of Medicaid payments being treated as payments made by the minor, the <u>Balzum</u> court analyzed (1) the statutory assignment of Medicaid recipients' rights of reimbursement to the state, (2) the doctrine of necessaries, and (3) public policy considerations.

Medicaid is operated jointly by the federal and state governments. To comply with federal requirements, states must require that Medicaid recipients assign their rights to reimbursement for medical care from third parties to the state. North Dakota enacted a statutory assignment of claims to comply with federal requirements:

> Each applicant or recipient of benefits under this chapter must be deemed to have assigned, to the department of human services, any right of recovery the applicant or recipient may have for medical costs incurred under this chapter not exceeding the amount of funds expended by the department for the care and treatment of the applicant or recipient. The applicant or recipient, or other person empowered by law to act in the applicant's or recipient's behalf, shall execute and deliver an assignment of claim, assignment of rights, or other authorizations as necessary to secure fully the right of recovery of the department.

---

[6] As defendants assert, state district court decisions are not considered precedential. <u>Fargo Pub. Library v. City of Fargo Urban Renewal Agency</u>, 185 N.W.2d 500, 503-04 (N.D. 1971).

N.D. Cent. Code § 50-24.1-02.1.[7] In <u>Grey Bear v. North Dakota Department of Human Services</u>, the North Dakota Supreme Court interpreted the statute to assign "any right of recovery" for an injury, even if designated as compensation for pain and suffering rather than as reimbursement for medical expenses, to the Department, though the Department's recoverable claims are limited to the amount of medical costs the Department incurred as a result of the injury. 651 N.W.2d 611, 617 (N.D. 2002). Thus, the <u>Grey Bear</u> court concluded the Department's statutory assignment attached to the entire settlement amount, even though the settlement was not designated as compensation for medical expenses. <u>Id.</u> Considering the <u>Grey Bear</u> decision, the <u>Balzum</u> court observed:

> In light of the North Dakota Supreme Court's interpretation of Section 50-24.1-02.1, a prohibition of Plaintiff Balzum's claim for pre-majority medical expenses on behalf of [her minor child] would give rise to a manifest injustice. If [the minor] recovered damages for her injuries, but was prohibited from bringing a claim for pre-majority medical expenses, she would lose the entire benefit of the damage award. This is because Plaintiff Balzum would be required to hold any such damage award for the Department of Human Services. Thus, if Plaintiff Balzum cannot maintain an action for medical expenses on behalf of [the minor], [the minor] would suffer an injustice which Section 50-24.1-02.1 of the North Dakota Century Code would require. Logically, therefore, to avoid such an offensive result, Plaintiff Balzum, on behalf of [the minor] will be allowed to pursue a cause of action for pre-majority medical expenses.

(D0c. 67-6, p. 10).

<u>Balzum</u> also discussed the doctrine of necessaries, which North Dakota has codified:

---

[7] Because D.M. now lives in Arizona, (Doc. 1, p. 1), and receives Medicaid benefits there, (Doc. 67-3, p. 121), the court also considers Arizona law on Medicaid assignment. To comply with federal requirements, Arizona has enacted a statute that provides for a lien against money recovered by or on behalf of a Medicaid recipient from a tortfeasor. <u>Ansley v. Banner Health Network</u>, 419 P.3d 552, 558 (Ariz. Ct. App. Apr. 3, 2018) (citing Ariz. Rev. Stat. § 36-2915(A) (2018)).

> A minor cannot disaffirm a contract, otherwise valid, to pay the reasonable value of things necessary for the minor's support or that of the minor's family, if such contract is entered into by the minor when not under the care of a parent, guardian, or conservator <u>able to provide for such minor</u> or the minor's family.

<u>Id.</u> (quoting N.D. Cent. Code § 14-10-12) (emphasis added). If parents of a child are not able to provide "things necessary for the minor's support," some courts have concluded the doctrine of necessaries may allow a child to bring a claim for medical expenses in his or her own name:

> [T]he doctrine of necessaries was never intended to be a limitation on a child's right to recover medical expenses from the person(s) responsible for causing them. It is merely an acknowledgment that for certain services, a minor should not be heard to disavow a contract which by personal necessity required his or her participation. In a case of catastrophic medical injury, we can certainly conceive of a situation where the parents can afford some but not all of the injured child's past, present, and future medical expenses. Assuming limitations has barred parental claims for such, the doctrine of necessaries protects an injured minor's right to recover from a tortfeasor medical expenses that his or her parents are ill-able to afford and for which he or she ultimately may be liable. Otherwise, the child would be twice victimized—once at the hands of the tortfeasor, and once by parents who, for whatever reason, failed to timely prosecute their claims for medical expenses. We cannot countenance a result that would leave the only innocent victim in such a transaction uncompensated for his or her injuries and potentially beholden to the compelled generosity of the taxpayer. Public policy and justice demand that an injured minor's right to recover medical expenses in his or her own name after limitations has barred parental claims begin where the parents' financial ability to provide for medical necessaries ends. That is the rule of <u>Garay</u>.

<u>Johns Hopkins Hosp. v. Pepper</u>, 697 A.2d 1358, 1365-66 (Md. 1997). As did the court in <u>Balzum</u>, this court finds it is reasonable to conclude from the fact of D.M.'s Medicaid qualification that Bonno and Moreno were not able to provide for all of D.M.'s medical expenses and the doctrine of necessaries could therefore allow D.M. to bring a claim for medical expenses in his own name.

Plaintiffs also cite a number of more recent cases in which state courts have declined to continue to follow the common law rule and have held that both a parent and a minor child have claims for pre-majority medical expenses of the minor, so long as there is no double recovery. (Doc. 67, p. 15). In one such case, <u>Estate of Desela v. Prescott Unified School District</u>, the Supreme Court of Arizona discussed the historical basis of the common law rule vesting the right to recovery for pre-majority medical expenses exclusively in the parents. 249 P.3d 767 (Ariz. 2011). The court noted the rule was rooted in the parent-child relationship historically being treated in economic terms, much like a master-servant relationship. Describing the common law master-servant analogy as "clearly antiquated and long overdue for judicial burial," the court overruled its precedent to the contrary and held the right to recover for pre-majority medical expenses belongs to both the parent and the child, though double recovery is not permitted. <u>Id.</u> at 769-70. In light of the discussion above, however, it does not appear necessary to consider whether North Dakota would adopt the reasoning of this line of cases.

Assuming North Dakota would adopt the common law rule that claims for pre-majority medical expenses belong to a parent, it would likely follow the majority of states which have recognized the exceptions described in <u>Garay</u>. In this court's opinion, several of those exceptions could apply: (1) D.M. could be considered to have paid his expenses by virtue of his status as a Medicaid beneficiary, (2) the Medicaid assignment statute could be considered a recovery "permitted by statute," (3) his recovery might be permitted under the doctrine of necessaries, or (4) if the parents' claims are considered barred under the statute of limitations, that could be considered a waiver in favor of D.M. This court therefore recommends that the motion for summary judgment on the claims

for pre-majority medical expenses be denied even if the district judge determines that the parents' loss of consortium claims and loss of earnings claims are barred by the statute of limitations.

**5.    Claims of D.M.'s Siblings**

As noted above, plaintiffs' complaint does not name D.M.'s siblings as parties. Nor does it allege any claim for their purported damages. But the opinions of plaintiffs' expert economist include valuations of the siblings' damages. In opposing the current motion, the plaintiffs do not directly assert that D.M.'s siblings—both of whom are younger than D.M.—are entitled to any recovery. Rather, they contend their expert economist's testimony "will help the average juror to understand the catastrophic impact of D.M.'s injuries and damages on his family." (Doc. 67, p. 17). At oral argument on the motion concerning exclusion of the expert economist's testimony, plaintiffs acknowledged that the siblings had no right to recover under North Dakota law.[8] Minutes of a recent phone conference with the trial judge indicate plaintiffs made the same acknowledgment during that conference. (Doc. 122). To the extent plaintiffs seek any award of damages to D.M.'s siblings for their loss of D.M.'s society and companionship, those claims should be dismissed.[9]

---

[8] A recording of that oral argument is available through the court's computer system.

[9] The parties do not cite, and the court's research has not identified, cases in which the North Dakota Supreme Court discussed whether siblings of an injured person have a claim for loss of society and companionship. Defendants, however, cite cases in which that court has held children do not have a right to recover for loss of a parent's society and companionship. Weigel v. Lee, 752 N.W.2d 618, 621 (N.D. 2008); Butz v. World Wide, Inc., 492 N.W.2d 88, 93 (N.D. 1992) (discussing cases recognizing parents' claims for loss of a child's society and companionship as indicative of a trend broadening the spectrum for loss of consortium claims but declining to recognize a

Plaintiffs argue, however, that since the siblings are too young to testify, their expert economist should be allowed to give opinions on the "loss of value of life, loss of household/family advice, counsel, guidance, instruction, training and accompaniment services, and loss of society and relationship damages for the Bonno/Moreno family" so that the jury can reach its own conclusions on the effect of D.M.'s injuries on his entire family. (Doc. 67, p. 17). Though plaintiffs assert defendants cite no authority disallowing testimony about a siblings' damages, plaintiffs themselves cite no authority supporting admission of that testimony. See id.

If D.M.'s parents are allowed to proceed with their claims for loss of D.M.'s society and companionship, it might be argued that the impacts of D.M.'s injuries on his siblings have a resulting impact on his parents. Testimony of the expert economist might then be somehow be relevant to the parents' damages claims. But in a separate pending motion, the defendants seek to exclude all testimony of plaintiffs' expert economist on the value of damages for loss of society and companionship. In light of that motion, which will be addressed in a separate Report and Recommendation, this opinion does not address whether the economist should be allowed to testify about impacts of D.M.'s injuries on his siblings.

**6.    Parents' Claims for D.M.'s Lost Wages and Household and Accompaniment Services**

Plaintiffs' expert economist has also opined on the parents' damages arising from D.M.'s future lost wages and employee benefits, beginning when D.M. reaches age 20.

---

child's claim for loss of parental consortium). There is no reason to believe the North Dakota Supreme Court would recognize a claim for loss of society and companionship by siblings of an injured person.

Further, the expert economist's opinion estimates damages D.M.'s parents have incurred for loss of D.M.'s household and accompaniment services. Sanford alleges those claims are time-barred, and further alleges that North Dakota law does not recognize a parents' claim based on "a child's alleged lost income, support, employment opportunities, employee benefits, and household and family accompaniment services." (Doc. 56, p. 15). Plaintiffs' brief does not address the issue.

Since the testimony of plaintiffs' expert economist is the subject of another pending motion, the court will address the issue in a separate Report and Recommendation.

**7.    Oral Argument**

Under Civil Local Rule 7.1(E), plaintiffs requested oral argument on this motion. (Doc. 69). Because the briefing of all parties is thorough, that motion is **DENIED** at this time.

### Conclusion

For the reasons discussed, this court **RECOMMENDS** defendants' motions for partial summary judgment dismissing Bonno and Moreno's claims, (Doc. 54; Doc. 62), be **DENIED**. In the event the motions are granted as to Bonno and Moreno's loss of consortium claims and claims for loss of earnings, this court **RECOMMENDS** the motions be **DENIED** as to Bonno and Moreno's claims for D.M.'s pre-majority medical expenses. To the extent plaintiffs seek any award of damages to D.M.'s siblings for their loss of D.M.'s society and companionship, this court **RECOMMENDS** the motions for partial summary judgment be **GRANTED**.

Dated this 31st day of January, 2019.

 /s/ *Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

### NOTICE OF RIGHT TO OBJECT[10]

Any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **February 14, 2019**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Responses to any objection are due by **February 21, 2019**. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[10] See Fed. R. Civ. P. 72(b); D.N.D. Civ. L.R. 72.1.