## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

The Families Advocate, LLC, an Arizona )
Limited Liability Corporation, as )
Conservator of D.M., a minor, and Sarina )
Bonno and Julian Moreno, individually, )
)
Plaintiffs, )                    Case No. 3:16-cv-114
)
vs. )              **REPORT AND RECOMMENDATION**
)              **ON MOTIONS TO EXCLUDE**
)              **TESTIMONY OF**
Sanford Clinic North d/b/a Sanford Clinic )   **STAN V. SMITH, PH.D.**
Jamestown, Sarah Schatz, M.D., and )
Lutheran Charity Association d/b/a )
Jamestown Regional Medical Center, )
)
Defendants. )

In this action, plaintiffs allege medical negligence surrounding the 2014 birth of

D.M. Plaintiffs are D.M.'s conservator—The Families Advocate, LLC—and D.M.'s

parents—Sarina Bonno and Julian Moreno. Defendants are (1) Sarah Schatz, M.D., the

attending physician at D.M.'s birth; (2) Sanford Clinic North d/b/a/ Sanford Clinic

Jamestown, Dr. Schatz's employer; and (3) Lutheran Charity Association d/b/a

Jamestown Regional Medical Center (JRMC), the hospital at which D.M. was born and

which employs various healthcare providers involved in the care of D.M. and his

mother.

The Sanford defendants and JRMC move to exclude certain testimony of Stan V.

Smith, Ph.D., an economist whom plaintiffs have disclosed to express opinions on

damages sustained by D.M. and his family. The opinions defendants seek to exclude

address reduction in value of D.M.'s life (RVL), loss of consortium, and loss of

"household/family services." (Doc. 57; Doc. 60). Plaintiffs oppose the motion. (Doc. 64).

Defendants argue plaintiffs cannot meet their burden of proof as to admissibility of Dr. Smith's testimony. While they do not challenge Dr. Smith's qualifications, they contend his testimony is unreliable, not helpful to the fact-finder, not generally accepted in the economics community, confusing or misleading to the jury, unfairly prejudicial, time-wasting, and inconsistent with North Dakota law on damages. The court heard oral argument on the motion on December 18, 2018.[1]

## Background

This dispute centers around hedonic damages, which Black's Law Dictionary defines as "damages that attempt to compensate for the loss of the pleasure of being alive." Damages, Black's Law Dictionary (10th ed. 2014). Dr. Smith is a proponent of quantification of hedonic damages. To quantify hedonic damages, Dr. Smith uses a "willingness to pay" method, considering various economic indicators to estimate the "value of life" and the reduction in the value of a life resulting from an injury. (See Doc. 58-1, pp. 2-4).

A recent case from the Western District of Missouri summarized Dr. Smith's qualifications:

> Dr. Smith [is] a well-qualified expert in the fields of economics and finance. Dr. Smith has a Ph.D. in economics. He has been involved in research and education in the field of forensic economics for over forty years. He is President of Smith Economics Group, Ltd., former Vice President of the National Association of Forensic Economics, [and a] ten-year member of the Board of Editors of the Journal of Forensic Economics . . . . He has published scholarly articles and textbooks on the subject of forensic economics and taught the first course in forensic economics nationwide. Dr. Smith has specialized knowledge, skill, and training in the field of economics, and has

---

[1] A digital recording of the hearing is available through the court's computer system.

been recognized as an economics expert in many courts throughout the country for more than three decades.

Streit v. Halverson, No. 17-4225-CV-WJE, 2018 WL 3763811, at *3 (W.D. Mo. Aug. 8, 2018).

## 1.    Dr. Smith's Proposed Testimony

Plaintiffs disclosed two reports by Dr. Smith. One report addresses Dr. Smith's opinions on "(1) the reduction in value of life ('RVL') [of D.M.], also known as loss of enjoyment of life; and (2) the loss of the society or relationship sustained by D.M.'s family." (Doc. 58-1, p. 1).[2] Dr. Smith's second report addresses "(1) the loss of wages and employee benefits; (2) the loss of household/family services, including (a) the loss of the advice, counsel, guidance, instruction and training services sustained by D.M.'s family; (b) the loss of accompaniment services sustained by D.M.'s family; and (3) the present value of [D.M.'s] future life care." (Doc. 58-2, p. 1). In their motions, defendants do not challenge Dr. Smith's testimony regarding D.M.'s loss of wages and employee benefits or regarding the cost of his future life care. (See Doc. 57; Doc. 60).

Dr. Smith's opinion on D.M.'s RVL rests on an assumed value of life, which he derived from a "willingness to pay" framework. To arrive at a value of life, Dr. Smith uses economic studies that purport to consider what society pays to preserve the ability to lead a normal life. (Doc. 58-1, p. 3). The studies he considers are of three general categories: (1) consumer purchases of safety devices, (2) wage risk premiums paid to

---

[2] Although the first report includes Dr. Smith's opinions on D.M.'s siblings' purported loss of society or relationship resulting from D.M.'s injury, plaintiffs have conceded D.M.'s siblings are not entitled to any award of damages. Dr. Smith's opinions concerning the siblings' loss of society or relationship are therefore not further addressed in this opinion.

workers in occupations carrying a higher risk of death on the job, and (3) cost-benefit analyses conducted in connection with consideration of various health and safety regulations. Id. at 4. Based on his meta-analysis of various studies from those three categories, Dr. Smith estimates the value of a life to be $4,700,000 in 2017 dollars.[3] Id. He then assumed an "impairment rating benchmark of 95% reduction in [D.M.'s] ability to lead a normal life," and assumed D.M. has a life expectancy of 77.2 years. Id. at 4. He adjusted for inflation by estimating real wage growth of 1.00%–based on U.S. Bureau of Labor Statistics data–and adjusted to present value using an estimated annual real discount rate of 1.25%–based on U.S. Treasury investment yields. Under that methodology, Dr. Smith estimates the RVL of D.M.'s life to be $6,874,871. Id. at 2-5.

Dr. Smith defines the "loss of society or relationship" as the loss to D.M.'s parents of the value of the love and affection D.M. would have provided to them but for his injury. Id. at 5. He states, "The value of the loss of society or relationship by family members with the injured can be based on a measure of the value of preserving the ability to live a normal life." Id. Though not explaining why, Dr. Smith chose a

---

[3] In arriving at this estimate Dr. Smith states he used a value of $4.1 million in 2008 dollars, adjusted for inflation, and made a 24% reduction in a "conservative average estimate" of the cited meta-analysis studies. In relevant part, the meta-analyses provided the following data:

| Author (Year) | Best Estimate | Range | Number of Values |
|---|---|---|---|
| Miller (2000) | $5.1m | $4.5-6.2m | 68 |
| Mrozek (2002) | $4.4m | $2.9-5.9m | 203 |
| Viscusi (2003) | $6.5m | $5.1-9.6m | 49 |
| Kochi (2006) | $6.0m | $3.4-8.6m | 234 |
| Bellavance (2009) | $7.5m | $6.1-8.9m | 37 |

(Doc. 58-1, pp. 11-12).

4

"benchmark loss" of 20% for each parent and estimated the value of Moreno's loss to be $1,137,227 and the value of Bonno's loss to be $1,282,839. Id. The differences in the estimated losses of Moreno and Bonno are not explained in Dr. Smith's report but may be attributable to a difference in their ages and life expectancies.[4]

Dr. Smith describes "household/family services" as a type of economic damages not including "loss of love, care, or affection, etc., but . . . the tangible services, valued as if they were provided by a person unknown to the household." (Doc. 58-2, p. 4). Within the category of loss of "household/family services," Dr. Smith identifies two types of losses: (1) loss of the "advice, counsel, guidance, instruction and training services" (hereinafter loss of advice and counsel) that D.M.'s parents cannot expect to receive from him because of his injury, and (2) loss of the "household/family [accompaniment] services" (hereinafter loss of accompaniment services) that D.M. would have provided to his parents but for his injury. Id. Dr. Smith describes loss of advice and counsel as a tangible economic loss "beyond the physical housekeeping chores." Id. at 12.

To derive his estimate of the value of lost advice and counsel, Dr. Smith examined mean hourly earnings of "educational, vocational, and school counselors; marriage and family therapists; child, family and school social workers; social and  human service assistants; clergy; directors of religious activities and education; coaches; elementary school teachers; and personal financial advisors." Id. at 5. He calculated mean hourly earnings in those occupations to be $27.28 in 2016 dollars, using U.S. Bureau of Labor Statistics data. Id. Dr. Smith then adjusted the mean hourly earnings to account for non-

_____

[4] A 2017 report of plaintiffs' expert rehabilitation consultant indicates Bonno was age 21 and Moreno was age 27 when the report was prepared. (Doc. 56-3, p. 9).

wage components and overhead expenses. Id. Though not explaining why, he chose a benchmark loss to each parent of one half hour per day of D.M.'s advice and counsel, beginning when D.M. reaches age 25. Id. at 6. He estimates total loss of the value of D.M.'s advice and counsel as $208,427 to Moreno and $279,284 to Bonno. Id. Again, the reason for the difference between the estimated losses for the two parents is not explained, but may be attributable to a difference in their ages and life expectancies.

Dr. Smith describes accompaniment services as the "normal social relationships that would be expected" between D.M. and his parents which were "completely disrupted" by his injury. Id. He based his estimate of the value of accompaniment services on mean hourly earnings of orderlies, attendants, home health aides, and personal care aides, which averaged $11.85 per hour in 2016 dollars using U.S. Bureau of Labor Statistics data. Id. at 7. He again adjusted to account for non-wage components and overhead expenses. Dr. Smith estimated D.M. would have provided his parents one hour of accompaniment services per day from ages 13 to 22 and a half hour per day thereafter, resulting in estimated total losses to Moreno of $148,136 and to Bonno of $178,901. Id. at 8.

## 2.    Defense Rebuttal Testimony

JRMC disclosed an opinion of economic consultant David D. Jones, Ph.D., in response to Dr. Smith's reports. Dr. Jones has over forty years of experience in the field and a substantial number of professional publications. (Doc. 65-1, pp. 19-20). Dr. Jones' opinion is critical of Dr. Smith's hedonic damages opinions and of his general theory, which Dr. Jones asserts Dr. Smith introduced into litigation in Sherrod v. Berry, 629 F.

Supp. 159, 162-64 (N.D. Ill. 1985), rev'd on other grounds, 856 F.2d 802 (7th Cir. 1988).

(Doc. 65-1, p. 1).

Dr. Jones points out that Dr. Smith uses the same estimate of value of life—$4,700,000—for all individuals, and so does not account for any differences among individuals.[5] Id. at 3. Dr. Jones analyzes the three categories of studies on which Dr. Smith's value of life estimation is based and asserts none of those studies can validly be used in the manner in which Dr. Smith employs them.

As to studies on consumer behavior and purchases of safety devices, Dr. Jones points out a perception issue regarding consumer decisions to purchase smoke detectors. Dr. Jones asserts that, for Dr. Smith's methodology to be valid, consumers would have to be willing to "spend $100 on a device that lowers the risk of death from 30 to 28 per 10,000 (by .00002 from .00030 to .00028)." Id. As Dr. Jones notes, the study of smoke detector purchases on which Dr. Smith relies acknowledges this problem:

> [T]he individual is required to react to small changes in small probability and to distinguish between the probability reductions of $2 \times 10^{-6}$ and $4 \times 10^{-6}$. This is a risk perception/risk response problem which has not been sufficiently addressed. Yet, it is fundamental to the entire willingness-to-pay approach.

Id. (quoting Rachel Dardis, The Value of a Life: New Evidence from the Marketplace, 70 Am. Econ. R. 1077, 1081 (Dec. 1980)).

Concerning wage-risk premium studies, Dr. Jones cites research showing an increased risk of death on the job does not necessarily lead to higher pay:

---

[5] The court imagines differences that could impact such an estimate might include gender, race, socioeconomic status, geographic location, academic achievement, probability of chronic disease, and propensity for mental illness, to name a few.

> The analysis finds that there is no statistically significant evidence that changes in occupational mortality are associated with changes in wages and, thus, there is no empirical basis for using the willingness-to-pay concept as a reliable method for valuing a life or evaluating regulatory policies.

Id. at 4 (quoting William P. Jennings & Albert Kinderman, The Value of a Life: New Evidence of the Relationship Between Changes in Occupational Fatalities and Wages of Hourly Workers, 1992 to 1999, 70 J. Risk and Ins. 549, 549 (Sept. 2003)) (using Bureau of Labor Statistics data for the period 1992-1999).

As to the cost-benefit studies done in connection with consideration of government regulations, Dr. Jones points out that many of the researchers who provided data on which Dr. Smith relies have rejected the idea of using that data for determining the value of life in litigation. Id. at 5-6. Dr. Jones and the researchers whom he cites assert that governmental estimates, made in the context of regulatory policy decisions, are "not in any way connected with the *joie de vivre* [joy of living] that an individual or family members might lose" because of an injury. Id. at 6.

Dr. Jones also criticizes Dr. Smith's use of 95% RVL and 20% loss of society in estimating losses of D.M. and his parents. Id. at 7. Dr. Smith's report cites an article, which he co-authored, stating that determination of those percentages requires ratings and judgments of a psychologist or mental health professional evaluating the individual subject. See Edward P. Berla, Michael L. Brookshire, and Stan V. Smith, Hedonic Damages and Personal Injury: A Conceptual Approach, 3 J. Forensic Econ., No. 1, at 3 (Winter 1990). As Dr. Jones notes, "Dr. Smith has not revealed the name of the medical professional who determined that D.M. will lose 95% and his family 20% each of their *joie de vivre* in the next seven decades." (Doc. 65-1, p. 7).

8

As to Dr. Smith's estimated loss of the value of D.M.'s "household/family services," Dr. Jones questions Dr. Smith's assumption that, after age 25,  D.M. would provide advice and counsel for one-half hour per day to each parent, and accompaniment services for one-half hour per day to each parent. Dr. Jones cites a recent government survey showing that men, on average, spend less that five minutes per day caring for and helping adults who are not part of their household. Id. at 17 (citing U.S. Department of Labor, Bureau of Labor Statistics "American Time Use Survey—2016 Results," USDL-11-0880, June 27, 2017).

Dr. Jones also cites a series of surveys of members of the National Association of Forensic Economics regarding testimony about hedonic damages. Id. at 8-12. From 1990 to 2017, the surveys reflect a decline in the number of forensic economists providing or willing to provide hedonic damages testimony, from 83 out of 159 in 1993 to 6 out of 165 in 2012. Id. at 12. Dr. Jones opines that these surveys "[do] not support [Dr. Smith's] contention that [hedonic damages] is 'generally accepted.'" Id. at 13.

### Law and Discussion

Analysis begins with Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

9

The standards for admission of expert testimony have evolved since the Supreme Court first discussed the court's gatekeeping role in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). As explained by the Eighth Circuit in 2014:

> Admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703. The screening requirement of Rule 702 has been boiled down to a three-part test:
>
>> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.
>
> <u>Polski v. Quigley Corp.</u>, 538 F.3d 836, 839 (8th Cir.2008) (quotation omitted). An expert's opinion is to be based on "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

> When the Supreme Court decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), federal courts were divided over the issue of whether the test from <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923) or the standards set forth in the Federal Rules of Evidence (which were not in existence when <u>Frye</u> was decided), governed the admissibility of expert testimony. <u>Daubert</u>, 509 U.S. at 586-87 & n.5. The restrictive <u>Frye</u> test allowed scientific expert testimony only with regard to concepts that had "general acceptance in [a] particular field." <u>Frye</u>, 293 F. at 1014. The <u>Daubert</u> Court held that the 1972 adoption of the Federal Rules of Evidence superseded the <u>Frye</u> test, finding that the admissibility of scientific evidence no longer was limited to knowledge or evidence "generally accepted" as reliable in the relevant scientific community. 509 U.S. at 588-89. Instead, Rule 702 mandates that the district court screen the admission of novel scientific evidence, and it must conclude, pursuant to Rule 104(a), that the proposed testimony is scientific knowledge, derived from the scientific method, that will assist the trier of fact, i.e., is relevant. <u>Id.</u> at 589-93. The district court's screening "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." <u>Id.</u> at 592-93. While the <u>Daubert</u> Court acknowledged that many factors would be instructive to the district court, it focused on four

non-exclusive factors: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the known rate of error for the technique or theory and the applicable standards for operation; and (4) whether the technique is generally accepted. Id. at 593-94.

Daubert and Rule 702 thus greatly liberalized what had been the strict Frye standards for admission of expert scientific testimony. Id. at 588 (highlighting the "liberal thrust" of the Federal Rules and their attempt to relax the previous roadblocks to expert testimony (quotation omitted)); see also Sappington v. Skyjack, Inc., 512 F.3d 440, 448 (8th Cir. 2008) (noting Rule 702's liberalization of expert testimony admission standard). Then in Kumho Tire Co. v. Carmichael, the Court expressly extended its Daubert reasoning to all expert testimony, not simply that which was considered "scientific." 526 U.S. 137, 147 (1999). . . . [C]ases are legion that, correctly, under Daubert, call for the liberal admission of expert testimony. See, e.g., United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) (holding that we resolve doubts about the usefulness of expert testimony in favor of admissibility); Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (holding that expert testimony should be admitted if it "advances the trier of fact's understanding to any degree" (quotation omitted)); Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (Rule 702 "clearly is one of admissibility rather than exclusion" (internal quotation omitted)); Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (holding that exclusion of expert's opinion is proper "only if it is so fundamentally unsupported that it can offer no assistance to the jury" (internal quotation omitted)). Further, district courts are admonished not to weigh or assess the correctness of competing expert opinions. Kuhn v. Wyeth, 686 F.3d 618, 625 (8th Cir. 2012). As long as the expert's scientific testimony rests upon good grounds, based on what is known it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset.

Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 561-62 (8th Cir. 2014) (citations altered). "Daubert's progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Lauzon v. Senco Prod., Inc., 270 F.3d 681, 687 (8th Cir. 2001) (citing Bogosian v. Mercedes-

Benz of N. Am., Inc., 104 F.3d 472, 479 (1st Cir. 1997); Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995); Claar v. Burlington N.R. Co., 29 F.3d 499 (9th Cir. 1994)).

Rule 702 is one of liberal admissibility. Johnson, 754 F.3d at 561; see also Lauzon, 270 F.3d at 686 ("The rule clearly is one of admissibility rather than exclusion."). The Eighth Circuit has explained:

> "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."

Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002) (citation omitted).

The Supreme Court has made clear, however, that "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). Moreover, "A district court must balance the probative value of such [expert] testimony against its possible prejudicial effects." United States v. Schwarck, 719 F.3d 921, 923 (8th Cir. 2013) (citing Daubert and Fed. R. Evid. 403, which provides for exclusion of any evidence if its probative value is substantially outweighed by danger of "unfair prejudice, confusing the issues, [or] misleading the jury").

Although Daubert set a broad and liberal standard, expert testimony must meet certain essential requirements to be admissible:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse*

> *dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Smith v. Cangieter, 462 F.3d 920, 924 (8th Cir. 2006). In other words, "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Virgin Atl. Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999), aff'd, 257 F.3d 256 (2d Cir. 2001) (cited with approval in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000)).

## 1.    Analysis of Dr. Smith's Proposed Testimony under Rule 702 and __Daubert__ Principles

The court considers Dr. Smith's proposed testimony in light of the primary factors the Eighth Circuit discussed in Johnson and Polski: relevance, qualifications,[6] and reliability. The Eighth Circuit has not ruled on admissibility of expert economic testimony on hedonic damages. But defendants urge the court to follow decisions of the First, Seventh, and Tenth Circuits, which have concluded Dr. Smith's testimony on the value of loss of enjoyment of life was inadmissible. See Smith v. Jenkins, 732 F.3d 51, 65-67 (1st Cir. 2013); Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1244-46 (10th Cir. 2000); Mercado v. Ahmed, 974 F.2d 863, 868-71 (7th Cir. 1992).

In finding Dr. Smith's testimony inadmissible, those three circuits have discussed his method of deriving a statistically average value of a life from a meta-analysis of three types of studies: consumer purchases of safety devices, wage risk premiums for dangerous jobs, and cost-benefit analyses performed in connection with governmental

---

[6] Defendants do not question Dr. Smith's qualifications as a forensic economist, so that factor is not addressed in this opinion.

regulations. The studies of consumer purchases of safety devices on which Dr. Smith relied purportedly indicate how much a statistically average person values her life based on willingness to purchase items such as smoke detectors, which reduce risk of mortality. (Doc. 58-1, p. 4). But, as discussed by the Seventh Circuit in <u>Mercado</u>, "spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth." 974 F.2d at 871. Dr. Jones, the defense economist, identifies one study estimating use of smoke detectors lowers the risk of death from 30 to 28 per 10,000 (a reduction of .00002, from .00030 to .00028). Dr. Jones questions whether smoke detector purchasers accurately perceive that minimal change in the risk of death. Purchasers' risk perception/risk response is fundamental to the willingness to pay model on which Dr. Smith's method is based. (Doc. 65-1, p. 3) (citing Dardis, <u>supra</u> p. 7, at 1081).

The First Circuit in <u>Jenkins</u> discussed Dr. Smith's use of wage risk premium studies, noting that humans' employment decisions are motivated by more than monetary incentives. 732 F.3d at 67. The court quoted a West Virginia case: "Anyone who is familiar with the wages of coal miners, policemen, and firefighters would scoff at the assertion that these high risk jobs have any meaningful extra wage component for the risks undertaken by workers in those professions." <u>Id.</u> (quoting <u>Wilt v. Buracker</u>, 443 S.E.2d 196, 205 (W.Va. 1993). In rebutting Dr. Smith's opinions, Dr. Jones cites studies showing "no statistically significant evidence that changes in occupational mortality are associated with changes in wages." (Doc. 65-1, p. 4).

As to cost-benefit analyses performed in connection with consideration of governmental regulations, Dr. Smith refers to a study on "the lifesaving resulting from the installation of smoke stack scrubbers at high-sulphur, coal-burning power plants." (Doc. 58-1, p. 4). But, as noted in Jenkins, "the cost of government health and safety regulations per life saved 'may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis 'hedonic analysis' implies, or even a mistaken policy.'" 732 F.3d at 67 (quoting Dorn v. Burlington N. Santa Fe R.R. Co., 397 F.3d 1183, 1195 (9th Cir. 2005)); see also Rascon v. Brookins, No. CV-14-00749-PHX-JJT, 2018 WL 739696, at *6 (D. Ariz. Feb. 7, 2018) ("The Court finds that Dr. Smith's calculations are too speculative and unconnected to how an individual values their life and is therefore not sufficiently tied to the facts of the case and is unhelpful to the jury in determining the 'loss of value of life.'")

Though the Eighth Circuit has not addressed admissibility of forensic economic testimony concerning hedonic damages, it has addressed admissibility of expert economic testimony in other contexts. In Junk v. Terminix International Co., the trial court ruled an expert economist's testimony about the effect of a mother's exposure to pesticide on her child's birth defects was inadmissible. 628 F.3d 439, 448-49 (8th Cir. 2010). The expert lacked data to follow his usual model for estimating toxic exposure levels and instead used a method comparing the circumstances the plaintiff experienced to several studies measuring effects of exposure to the pesticide. Id. at 448. The district court found the expert's analysis did not account for differences in conditions between the plaintiffs' home and the data on which the studies were based. Id. The Eighth Circuit agreed, finding the expert failed to follow his own general practice, relied on unfounded

assumptions, failed to connect the general data to the specific situation, and consequently left too great an analytical gap between his opinion and the data on which it relied. Id.

Children's Broadcasting Corp. v. Walt Disney Co. addressed admissibility of a forensic economist's expert testimony regarding the effects of defendant's alleged wrongful acts on the valuation of the plaintiff's business. 245 F.3d 1008, 1017-18 (8th Cir. 2001), The expert testified that any one of several alleged wrongful acts would have resulted in the same diminution of value. Id. at 1018. The court upheld exclusion of that testimony as "dubious," concluding the "theory of causation was questionable" and the economic analysis too attenuated from the specific facts of the case. Id.

Plaintiffs contend that the average juror would be unable to understand the catastrophic impact of D.M.'s injuries on him and his parents and that Dr. Smith's testimony would help the jury understand that impact. Plaintiffs describe D.M.'s injuries as "severe, permanent, and debilitating brain injuries." (Doc. 64, p. 2). According to plaintiffs' description—which defendants have not contested—D.M. (1) will never be able to stand, walk, talk, or care for himself; (2) is confined to a wheelchair and will never be able to move around his community independently; (3) has impaired vision and severely impaired cognition; (4) will never be able to read, write, hold employment, or socialize; and (5) will require lifetime 24-hour care and supervision. (Doc. 56-3, pp. 8-9).

Under Lauzon, Junk, and Children's Broadcasting, an important consideration is whether the proposed expert's testimony is sufficiently connected with the facts of the case. Dr. Smith states he reviewed the report of plaintiffs' expert rehabilitation consultant and a case information form. (Doc. 58-1, p. 2). But Dr. Smith used little data

16

to connect his methodology to the facts of this case: D.M.'s life expectancy of 77.2 years, an assumed 95% reduction in D.M.'s enjoyment of life, and an assumed 20% reduction in the value of the society and relationship D.M. would have provided to his parents but for his injury. The court presumes the life expectancy estimate is based on well-established mortality tables and an assumption that D.M. has a normal life expectancy.[7] But Dr. Smith is not qualified to opine on D.M.'s level of impairment or the degree of his parents loss of D.M.'s society and relationship. See Streit, 2018 WL 3763811, at *3. The 95% impairment assumed for D.M. and the 20% loss of society and relationship assumed for each of his parents appear to be arbitrary. Nor are there facts connecting the number of lost hours of "household/family services," which Dr. Smith assumed with facts specific to this case.

**2.      Admissibility under North Dakota Law of Damages**

Defendants further argue Dr. Smith's proposed testimony should be excluded because it is inconsistent with North Dakota statutes which define economic and noneconomic damages:

> In any civil action for damages for wrongful death or injury to a person and whether arising out of breach of contract or tort, damages may be awarded by the trier of fact as follows:
>
> 1. Compensation for economic damages, which are damages arising from medical expenses and medical care, rehabilitation services, custodial care, loss of earnings and earning capacity, loss of income or support, burial costs, cost of substitute domestic services, loss of employment or business or employment opportunities and other monetary losses.

---

[7] An opinion of plaintiffs' expert rehabilitation consultant references D.M. having a life expectancy to age 70. (Doc. 56-3, p. 9).

2. Compensation for noneconomic damages, which are damages arising from pain, suffering, inconvenience, physical impairment, disfigurement, mental anguish, emotional distress, fear of injury, loss or illness, loss of society and companionship, loss of consortium, injury to reputation, humiliation, and other nonpecuniary damage.

N.D. Cent. Code § 32-03.2-04; see also N.D. Cent. Code § 32-42-01(8).[8] In any healthcare malpractice action, plaintiffs may be awarded no more than $500,000 in total noneconomic damages regardless of the number of plaintiffs, the number of defendants, or the number of claims in the action. N.D. Cent. Code § 32-42-02.

The North Dakota Supreme Court affirmed a trial court's refusal to instruct the jury on loss of enjoyment of life as a separate element of damages:

> We are not convinced that the trial court erred in refusing the plaintiffs' request to instruct on loss of enjoyment of life as a separate element of damages in this case. It would have been appropriate for the plaintiffs to have argued loss of enjoyment of life as a component of pain, discomfort, mental anguish, and impairment of health, mind, or person, all of which were set forth in the trial court's instructions as recoverable elements of damages in this case. We conclude that the trial court's instructions adequately apprised the jury of the law on damages and that the trial court did not err in refusing to give the plaintiffs' requested instruction.

First Trust Co. of N.D. v. Scheels Hardware & Sports Shop, Inc., 429 N.W.2d 5, 13-14 (N.D. 1988). But plaintiffs urge the court to interpret Scheels in their favor:

> The North Dakota Supreme Court, in Scheels, specifically stated that damages include the "loss of enjoyment of life as a component of pain, discomfort, mental anguish, and impairment of health, mind, or person." The court determined that loss of enjoyment of life was within the instruction on recoverable elements of damages.

(Doc. 64, p. 6) (citation omitted). Plaintiffs analogize Dr. Smith's calculations to economic models that project future earnings, life expectancy, and earnings

---

[8] The North Dakota Pattern Jury Instructions, C-70.35 (2000), use the same definitions of economic and noneconomic damages.

consumption, asserting his opinions would "merely provide guidance to the jury in making a determination of a proper damages award." Id. In this court's opinion, Scheels would allow plaintiffs to argue loss of enjoyment of life as a component of noneconomic damages, but Scheels lends no support to admission of Dr. Smith's calculations regarding D.M.'s estimated loss of enjoyment of life.

In discussing determination of noneconomic damages, the North Dakota Supreme Court has stated that "the determination of damages for pain and suffering and comparable losses is not susceptible of an arithmetical calculation. Its ascertainment must, to a large degree, depend upon the common knowledge, good sense and practical judgment of the jury." Dahlen v. Landis, 314 N.W.2d 63, 68 (N.D. 1981) (quoted with approval in Albrecht v. Metro Area Ambulance, 623 N.W.2d 367, 371 (N.D. 2001)); see also Slaubaugh v. Slaubaugh, 466 N.W.2d 573, 577 (N.D. 1991) ("The determination of damages for pain, suffering, and mental anguish . . . . rests largely within the sound discretion of the jury."). "By nature, damages for future pain, discomfort, and mental anguish are more speculative than damages for past pain, discomfort, and mental anguish." Slaubaugh, 466 N.W.2d at 577 n.1.

In this court's opinion, plaintiffs' characterization of loss of "household/family services" as economic damages, (Doc. 64, p. 9), is not consistent with North Dakota Century Code section 32-03.2-04(1). While the statute includes "cost of substitute domestic services" as an element of economic damages, Dr. Smith views the loss of "household/family services" as "economic loss of household family services beyond the physical housekeeping chores." (Doc. 58-2, p. 6). Dr. Smith's definition of "household/family services"—advice and counsel, and accompaniment services—is more

akin to loss of society and companionship, loss of consortium, or "other nonpecuniary damage" elements of section 32-03.2-04(2). In this court's view, a parent's recovery for loss of a child's society and companionship encompasses both the loss of advice and counsel and loss of accompaniment services that Dr. Smith defines as loss of "household/family services."

### 3.     Danger of Unfair Prejudice, Confusion, and Misleading Jury

Defendants argue Dr. Smith's testimony about "household/family services" would be confusing, misleading, and unduly prejudicial. They argue it is an attempt to treat noneconomic damages as economic damages and there is a danger the jury would accept Dr. Smith's testimony because he is characterized as an expert. (Doc. 61, pp. 8, 19-20).

Federal Rule of Evidence 403 permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury." See Burckhard v. BNSF Rwy. Co., 837 F.3d 848, 855 (8th Cir. 2016). "Unfair prejudice [under Rule 403] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Confusion of the issues warrants exclusion of relevant evidence if admission of the evidence would lead to litigation of collateral issues." Firemen's Fund Ins. Co. v. Thien, 63 F.3d 754, 758 (8th Cir. 1995) (citation omitted).

As one forensic economist has written,

[T]he uses to which [value of life] estimates have been put have not been consistent with the meaning of the estimates or the purposes of compensation in tort cases. Instead, the hedonic values of life provided a mechanism for plaintiffs' attorneys to get multi-million dollar damages

numbers in front of juries in the hopes of providing a high-dollar anchor for
their deliberations.

(Doc. 65-1, p. 6) (quoting W. Kip Viscusi, <u>Misuses and Proper Uses of Hedonic Values of
Life in Legal Contexts</u>, 13 J. Forensic Econ., no. 2, at 111, 124 (2000)). In this court's
opinion, there is significant danger of Dr. Smith's testimony leading to jury confusion as
to economic and noneconomic damages it could consider.

### 4.    Acceptance by Trial Courts in North Dakota and Eighth Circuit

Plaintiffs state Dr. Smith's testimony has "long been recognized as admissible in
the Federal Eighth Circuit and North Dakota state courts." (Doc. 64, p. 8). They assert
his testimony was admitted in three cases in North Dakota state courts: <u>Gessner v. Ward
Cty. Water Mgmt. Dist.</u>, Ward County Case No. 51-94-C-00912; <u>Baehm v. Steen</u>, Ward
County Case No. 51-90-C-01100; and <u>Werner v. Pueringer Distrib., Inc.</u>, Ward County
Case No. 51-91-C-00892. (Doc. 64, p. 8). Each of those three cases was filed over twenty
years ago, prior to many of the cases discussed above having been decided. Dockets of
the three cited North Dakota cases are not electronically available, and plaintiffs
provided no copies of orders reflecting decisions admitting Dr. Smith's testimony. The
court is therefore unable to consider reasoning employed in any of the decisions or
whether the testimony Dr. Smith offered in any of those cases was similar to his
proposed testimony in this case. And defendants submitted a document demonstrating
another North Dakota state trial court decided Dr. Smith's testimony on hedonic
damages was inadmissible. (Doc. 65-2). Moreover, as defendants note, North Dakota
has not adopted <u>Daubert</u>. (Doc. 66, p. 3) (citing <u>State v. Hernandez</u>, 707 N.W.2d 449,
453 (N.D. 2005)).

Plaintiffs further argue Dr. Smith's testimony was admitted in three district court cases within the Eighth Circuit: <u>Lee v. Overby,</u> No. 2:08-cv-2115, Doc. 93 (W.D. Ark. Order dated Jul. 31, 2009), <u>Snodgrass v. Centerpoint Energy, Inc.</u>, No. 4:03-cv-866, Doc. 61 (E.D. Ark. Order dated Jan. 6, 2005), and <u>Citizens Bank of Batesville, Ark. v. United States</u>, No. 1:01-cv-104, Doc. 28 (E.D. Ark. Order dated Aug. 1, 2002). As defendants note, Eighth Circuit law does not accord precedential weight to district court opinions within the circuit. <u>See</u> <u>United States v. Auginash</u>, 266 F.3d 781, 784 (8th Cir. 2001).

All three cases addressed an Arkansas statute defining damages in wrongful death claims: "In addition to all other elements of damages provided by law, a decedent's estate may recover for the decedent's loss of life as an independent element of damages." Ark. Code Ann. § 16-62-101(b). <u>Snodgrass</u> addressed admission of testimony of Dr. Charles E. Venus, whom plaintiffs assert based his opinions on the same methodology as does Dr. Smith. (Doc. 64, p. 9 n.3). <u>Citizens Bank</u> was tried to a judge rather than a jury, and an order denying a motion to exclude Dr. Smith's testimony before trial stated the court would determine admissibility at the time of trial. All three cases involved admissibility of expert evidence pursuant to Arkansas Code section 16-62-101(b). Arkansas courts have interpreted "loss-of-life" damages as loss of the value that the decedent would have placed on his or her own life. <u>See</u> Joshua M. Robles, <u>Tort Law—Hedonic Damages—Arkansas's Application of Hedonic Damages to Wrongful-Death Suits: Is Arkansas's Method Misconceived?</u>, 33 U. Ark. Little Rock L. Rev. 299, 321-22 (2011). Since all three cases applied a provision not found in North Dakota law, they are distinguishable from the present case. Moreover, as the First

Circuit discussed in <u>Jenkins</u>, the value of life is different from the value of enjoyment of life. 732 F.3d at 67.

## 5.    Acceptance by Other Courts

In his report, Dr. Smith states, "My testimony on the value of life has been accepted in approximately 200 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions." (Doc. 58-1, p. 4). To their brief in opposition to the motion, plaintiffs attached a 22 page list of cases in which Dr. Smith had testified between October 2013 and October 2017. (Doc. 64-2). Plaintiffs also attached a 31-page list which Dr. Smith identifies as cases in which his testimony on loss of enjoyment of life was ruled admissible at trial, arbitration, or mediation. (Doc. 64-3). This court has not researched each of the hundreds of cases on those lists. None were venued in North Dakota state courts or in this federal district. A few were venued in other districts within the Eighth Circuit.

Of the four cases this court identified as venued within other districts in this circuit, review of the dockets showed no orders finding Dr. Smith's testimony on RVL, loss of society and relationship, or loss of "household/family services" admissible. An order in <u>Monohon v. BNSF Railway Co.</u> addressed only Dr. Smith's testimony on "front pay and/or future wage and benefit losses," and determined those losses were equitable in nature and would be presented to the court outside the presence of the jury. No. 4:14-cv-305, Doc. 131 (S.D. Iowa Order dated May 16, 2016). Review of the docket in another case in that district shows no orders addressing admissibility of Dr. Smith's testimony. <u>Foster v. BNSF Ry. Co.</u>, No. 4:14-cv-313 (S.D. Iowa). The same is true of a case in the District of Nebraska—Dr. Smith was disclosed as an expert, but the docket includes no

orders addressing admissibility of his testimony. <u>Krupnikovic v. Sterling Transp. Servs.,</u> <u>Inc.</u>, No. 8:14-cv-352 (D. Neb.). The plaintiff in <u>Howze v. United States</u> disclosed Dr. Smith as a witness on damages of the same nature as those disclosed regarding D.M. and his parents. No. 2:16-cv-3 (E.D. Ark). The defendant moved to exclude that testimony, and it appears the case was resolved prior to a ruling on the motion. <u>Id.</u> at Doc. 50 (motion dated July 20, 2017).

In short, this court's review of the four cases described above suggests Dr. Smith significantly overstated the degree to which his testimony has been accepted by other courts. A 2014 article in the field of forensic economics asserts only one federal district court case has admitted Dr. Smith's testimony on quantified hedonic damages under a <u>Daubert</u> standard. <u>See</u> Thomas R. Ireland, <u>Legal Decisions Involving Hedonic Damages</u> <u>from January 2013 to February 2018</u>, J. Legal Econ., September 2018, at 51, 53; <u>Farring</u> <u>v. Hartford Fire Ins. Co.</u>, No. 2:12-cv-479, 2014 U.S. Dist. LEXIS 33488 (Mar. 14, 2014).

## Conclusion

For a myriad of reasons, there are significant questions about admissibility of Dr. Smith's testimony on reduction in value of life, loss of society and relationship, and loss of "household/family services." Dr. Smith uses little data specific to this case, and the basis for his use of the specific data is not explained; he does not explain his assumptions of a 95% reduction in value of D.M.'s life, of a 20% loss of society and relationship for each of D.M.'s parents, of the time D.M. would provide "household/family services" to his parents but for his injury, or of D.M.'s life expectancy. There is reason to question the validity of Dr. Smith's reliance on consumer purchases of safety devices, wage premiums for risky occupations, and cost-benefit analyses done in

connection with health and safety regulations. There is reason to question whether Dr. Smith's methods are generally accepted among forensic economists. Dr. Smith—and plaintiffs' counsel—appear to have overstated other courts' acceptance of his methodologies. Even if his methodology on determining value of <u>a</u> life were accepted, this court questions whether loss of life can be equated with loss of enjoyment of life. For these reasons, this court would conclude that plaintiffs have not shown Dr. Smith's testimony meets the relevance and reliability standards the Eighth Circuit described in <u>Johnson</u> and <u>Polski</u>. Additionally, there is a significant question as to whether Dr. Smith's opinions are consistent with North Dakota Century Code section 30-03.2-04's definition of recoverable damages.

This court **RECOMMENDS** that Dr. Smith's testimony on reduction in value of life, loss of society and relationship, and loss of "household/family service" be excluded. The motions of the Sanford defendants, (Doc. 57), and of JRMC, (Doc. 60), should be **GRANTED**.

Dated this 11th day of February, 2019.

/s/ *Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

## Notice of Right to Object[9]

Any party may object to this Report and Recommendation by filing with the Clerk of Court no later than February 25, 2019, a pleading specifically identifying those

---

[9] <u>See</u> Fed. R. Civ. P. 72(b), D.N.D. Civ. L.R. 72.1.

portions of the Report and Recommendation to which objection is made and the basis of any objection. Any responses to an objection are due by March 4, 2019. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.