IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

**THE FAMILIES ADVOCATE, LLC,**
an Arizona Limited Liability Corporation,
as Conservator of D.M., a Minor;
and **SARINA BONNO** and **JULIAN MORENO,**
Individually                                                                                              **PLAINTIFFS**

V.                                      **CASE NO. 3:16-CV-00114**

**SANFORD CLINIC NORTH d/b/a
SANFORD CLINIC JAMESTOWN;
SARAH SCHATZ, M.D.; and LUTHERAN
CHARITY ASSOCIATION d/b/a
JAMESTOWN REGIONAL MEDICAL CENTER**                                **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is the Report and Recommendation ("R&R") (Doc. 136) of the Honorable Alice R. Senechal, United States Magistrate Judge for the District of North Dakota, filed in this case on February 11, 2019, concerning a Motion to Exclude Certain Testimony of Dr. Stan V. Smith (Doc. 57) filed by Defendants Sanford Clinic North d/b/a Sanford Clinic Jamestown and Sarah Schatz, M.D. ("the Sanford Defendants") and a Motion to Exclude Testimony of Stan V. Smith, Ph.D. (Doc. 60) filed by Defendant Lutheran Charity Association d/b/a Jamestown Regional Medical Center ("JRMC"). The Magistrate Judge heard oral argument on the motions on December 18, 2018. In her R&R, she recommends granting the motions and excluding from trial Dr. Smith's proposed testimony concerning: (1) the amount needed to compensate D.M. for the reduction in value of his life as a result of certain neurological injuries he suffered at or around the time of his birth, (2) the amount needed to compensate D.M.'s parents for the loss of consortium with D.M., and (3) the amount needed to compensate D.M.'s parents for the loss of D.M.'s "household/family services."

1

Plaintiffs filed timely and specific objections to the R&R on February 25, 2019 (Doc. 141), and the Sanford Defendants and JRMC each filed a Response to those Objections (Docs. 148, 149) on March 4, 2019. Now that the matter is ripe, the Court has conducted a *de novo* review as to all proposed findings and recommendations to which Plaintiffs have raised specific objections. *See* 28 U.S.C. § 636(b)(1). As explained below, all objections are **OVERRULED**, and the R&R is **ADOPTED IN FULL**.

## I. BACKGROUND

Defendants' motions in limine seek to exclude from trial certain expert testimony offered by an economist named Dr. Stan V. Smith on the subject of hedonic damages. Hedonic damages attempt to compensate a victim for the loss of the pleasure of being alive; and/or in the case of a minor victim, hedonic damages attempt to compensate the minor victim's parents or guardians for the loss of the pleasure of the minor's society and companionship. (Doc. 136 at 2). Defendants do not dispute that Dr. Smith is a well-qualified expert in the areas of economics and finance. However, they contend that his computation of hedonic damages rests on an assumed value of life that is arbitrary and unreliable, and that his opinions (or "examples") as to the amount of hedonic damages will be unhelpful, confusing, misleading, and/or a waste of the jury's time, all to the Defendants' unfair prejudice. Lastly, Defendants argue that Dr. Smith's proposed computation of certain categories of hedonic damages is inconsistent with North Dakota's law on damages.

Two of Dr. Smith's expert reports are discussed in Defendants' motions. In the first report, Defendants challenge the admissibility of Dr. Smith's opinions and testimony concerning his calculation of the reduction in value of D.M.'s life (also known as loss of

2

enjoyment of life) resulting from certain neurological injuries D.M. suffered at or around the time of birth. Defendants also contest Dr. Smith's calculation of the value of the loss to D.M.'s parents of the "society or relationship" D.M. would have provided them, but for his injury. With respect to Dr. Smith's second report, Defendants challenge the admissibility of his opinions regarding the value of the parents' loss of D.M.'s "household services," which include the value of D.M.'s advice, counsel, guidance, and instruction to his parents, as well as the loss of his "accompaniment services."

After reviewing the applicable legal standards and analyzing Dr. Smith's reports and the parties' briefing, Magistrate Judge Senechal concluded as follows:

> [P]laintiffs have not shown Dr. Smith's testimony meets the relevance and reliability standards the Eighth Circuit described in Johnson and Polski. Additionally, there is a significant question as to whether Dr. Smith's opinions are consistent with North Dakota Century Code section 30-03.2-04's (sic) definition of recoverable damages.

(Doc. 136 at 25). She therefore recommended granting Defendants' motions and excluding from trial Dr. Smith's testimony on the reduction in value ("RVL") of D.M.'s life, the value of the loss to D.M.'s parents of his society and relationship, and the value of the loss to D.M.'s parents of his household/family services.

Plaintiffs have made four objections to the R&R (Doc. 141). First, they contend that it was error for the Magistrate Judge to conclude that Dr. Smith used little data to connect his methodology to the facts of the case. Plaintiffs appear to argue in their first objection that the Federal Rules of Evidence do not require them to present *any underlying facts or data* to support Dr. Smith's opinions—though they admit such underlying facts or data do exist and were presented to the Magistrate Judge for her consideration. As for the second objection, Plaintiffs contend the Magistrate Judge erred in recommending the exclusion

3

of Dr. Smith's testimony as to his calculation of the reduction in value ("RVL") of D.M.'s life and the value of the loss to D.M.'s parents of his household/family services. Plaintiffs' third objection is that the Magistrate Judge erred in finding that Dr. Smith's testimony in these contested areas would lead to juror confusion. Plaintiffs' fourth objection is that the Magistrate Judge erred in finding that Dr. Smith's calculation of damages in these contested areas is unreliable. The Court will consider each of these objections in turn.

## II. LEGAL STANDARD

Defendants' motions in limine ask the Court to invoke its "gate-keeping function" to ensure that an expert's opinion is "supported by the kind of scientific theory, practical knowledge and experience, or empirical research and testing that permit assessment 'of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Robertson v. Norton Co.,* 148 F.3d 905, 907 (8th Cir.1998) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93 (1993)). Whether to exclude or allow expert testimony is committed to the district court's sound discretion, subject to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014).

Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

4

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)).

When making this sort of inquiry—which is often referred to as a *Daubert* challenge, *see Daubert v. Merrell Dow Pharm, Inc.,* 509 U.S. at 592–93—the Court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that the requirements set forth in *Daubert* and its progeny are satisfied; however, if a close case presents itself, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). In doing so, "a court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" *Id.* at 758 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### III. DISCUSSION

#### A. Objection One

Plaintiff's first objection takes issue with the Magistrate Judge's finding that Dr. Smith used little data to connect his methodology to the facts of the case. The objection leads with a rather bizarre argument: that pursuant to Federal Rule of Evidence 705, "*Dr.*

5

*Smith was not required to disclose underlying facts and data in his expert reports*." (Doc. 141 at 6 (emphasis in original)). The Court cannot fathom what Plaintiffs are driving at in making this argument. Certainly, if it were the case that Dr. Smith's testimony were being presented *at trial*, Rule 705 would govern the presentation of that testimony, and Dr. Smith could "state an opinion—and give the reasons for it—without *first* testifying to the underlying facts or data." Fed. R. Evid. 705. But that is not the posture here. The Defendants have challenged the admissibility of expert testimony *prior to trial* through a *Daubert* challenge. That challenge is governed by *Daubert* and its progeny, as informed by *Rule 702*, not Rule 705. And the relevant standard in this circuit requires expert opinion testimony to be supported by sufficient facts or data, and the product of reliable principles and methods as applied to the particular facts of the case before the court. *Johnson*, 754 F.3d at 562.

Turning first to the facts and data disclosed to the Magistrate Judge through motion practice, there is no dispute that Dr. Smith calculated what he thought would be the value of *a statistical life*—not D.M.'s particular life—based on his own amalgamation of different types of economic studies, such as variances in incremental pay for risky occupations; consumer behavior in purchasing safety devices relative to theoretical risk reduction; and cost-benefit analyses used in governmental policy making decisions and regulatory applications. (Doc. 58-1 at 3-4). Dr. Smith then arbitrarily selected an "impairment rating benchmark of a 95% reduction in [D.M.'s] ability to lead a normal life." (Doc. 58-1 at 4). After accounting for a hypothetical lifespan of more than 77 years (which Defendants do not contest for purposes of the instant motions), and adjusting for the time value of money,

6

Dr. Smith opines that D.M.'s total RVL—the total reduction in the value of D.M.'s life throughout his expected lifetime due to his injuries—would be $6,874,871.

Next, Dr. Smith calculated the value of D.M.'s parents' loss of their child's society or relationship. To do this, Dr. Smith assumed a "benchmark loss" of 20% for each parent without explaining why. The value of D.M.'s father's loss of D.M.'s society or relationship was calculated to be $1,137,227, and his mother's loss was calculated to be slightly higher, at $1,282,839. Again, no explanation was offered as to why the father's expected loss was different from the mother's, though the Magistrate Judge speculated that the discrepancy could have been due to a difference in the two parents' expected lifespans. Regardless, and just as noted above with respect to the RVL calculation, it is evident that Dr. Smith used certain multipliers, such as the "benchmark loss" factor of 20%, that appear wholly arbitrary.

In ruling on Objection One, the Court also reviewed Dr. Smith's deposition testimony, which Plaintiffs appended to their objections to the R&R. Plaintiffs argue in a footnote that the deposition transcript "demonstrates that counsel for the Defendants bringing the Motions to Exclude failed to elicit the underlying facts or data for Dr. Smith's opinions during his discovery deposition." (Doc. 141 at 7 n.2). Quite to the contrary, the Court believes defense counsel elicited a great deal of information from Dr. Smith regarding the underlying facts, data, and assumptions he used to support his opinions. A few examples from the deposition illustrate the point and demonstrate quite convincingly the correctness of the Magistrate Judge's recommendation to exclude Dr. Smith's contested testimony:

- Dr. Smith estimated the "value of accompaniment" provided by D.M. to his parents by starting the calculation in the year that D.M. is expected to reach age thirteen. When counsel cross-examined Dr. Smith as to why he chose age thirteen, rather than some other year, he responded:

  > We just invite the jury to consider that at age 13, when some people were managing and running countries in Europe in the 1500s, that a young man, 13 years old, age of—age of manhood in the Hebrew culture, for example, that at that age, he could begin providing services of—of what we call accompaniment to his family members.

  (Doc. 141-2 at 16).

- Dr. Smith estimated the value of D.M.'s "advice and counsel" to his parents by starting the calculation in the year that D.M. is expected to reach age twenty-five. When counsel asked Dr. Smith why he started calculating this category of damages at age twenty-five, rather than some other age, Dr. Smith reasoned:

  > In fact, Bill Gates started Microsoft well before then. So lots of people have the capacity to provide advice, counsel, guidance, training, instruction to family members once they get into their 20s . . . but we don't value it before that.

  *Id.* at 18.

- Dr. Smith admitted multiple times in his deposition that he never met with D.M. or his parents and never discussed with them any of his proposed calculations. *See, e.g., id.* at 32.

- Dr. Smith confirmed that he did not consult a psychologist or medical professional in arriving at the 95%-reduction rate for RVL that he applied to D.M. Dr. Smith also agreed he was not an expert "on determining the

- reduction in the value of life as a percentage for any given person." *Id.* at 34.

- Dr. Smith later clarified in his deposition that the 95%-reduction figure was not intended to apply accurately *to D.M.*, but was instead intended to be presented to the jury as "an example" of a possible calculation for RVL for a given person. He agreed that the facts underlying this particular calculation were essentially arbitrary, and he confirmed that this type of inquiry was one the jury could perform just as well as he could, by choosing its own arbitrary percentages and doing the math. He explained:

   > I'm not advocating any percentage. I offer a percentage that I think that, in my view, the jury may consider interesting to review, but if they believe the number should be 80 percent or 40 percent, it's—it's—it's a 30-second mathematical computation.

   *Id.* at 36.

- He also testified that the 20% figure he had used to discount D.M.'s RVL and arrive at D.M.'s parents' values for their loss of society or relationship with D.M. was simply "an example," *id.* at 37, not based on any empirical evidence. He confirmed that the percentage he selected "need not be based on anything and it is not based on anything . . . ." *Id.* at 38.

- Finally, Dr. Smith and counsel engaged in the following colloquies on the subject of whether Dr. Smith had considered the facts of this particular case in arriving at his opinions:

   > Q. Did you consider the parents' earning history or family earning history in any of your assumptions?
   > A. No, it would be outside the scope of my need to do so.
   > . . .

> Q. You never had any intake or meeting with Mr. Moreno or Ms. Bonno, the parents of D.M., correct?
> A. Correct.

*Id.* at 80-81.

Dr. Smith's opinions are marinated in a proprietary blend of theoretical "studies" (developed for use in other contexts), and peppered with arbitrary "benchmarks" *a la ipse dixit*, and, finally, tabulated with present value spreadsheets to give the illusion of forensically precise calculations in D.M.'s specific case. Beyond the illusion, the reality is more akin to hocus pocus. And this Court is certainly not alone in finding Dr. Smith's methodologies suspect and unreliable.[1] Dr. Smith's calculations are based on arbitrary figures and assumptions that are unrelated to the facts of the case. An expert's calculations should be excluded when they are "so fundamentally unsupported that [they] can offer no assistance to the jury." *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (citations omitted).[2]

---

[1] See *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013) (collecting cases in support of its finding that "[t]he overwhelming majority of courts have concluded that [Dr. Smith's] "willingness-to-pay" methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both).

[2] This is the very conclusion reached by the First, Tenth, and Seventh Circuits, and this Court finds their opinions very persuasive. *See Smith v. Jenkins*, 732 F.3d 51, 65-67 (1st Cir. 2013) (expressing "serious doubts" that Dr. Smith's calculation of RVL, which "relies on labor market studies reflecting wage risk premiums," "actually measure[s] the value of life," and finding that the calculation would be "of no assistance to the jury" since it is "based on assumptions that appear to controvert logic and good sense" (citation and quotations omitted)); *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244-46 (10th Cir. 2000) (affirming the trial court's pre-trial exclusion of Dr. Smith's "valuations of a statistical human life," which were deemed "unreliable" and "unhelpful and confusing to the jury," while allowing him to testify about the definition of hedonic damages); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (affirming the district court's exclusion of Dr. Smith's testimony at trial, "despite Smith's training, extensive research and countless calculations," because it was clear that "Smith was no more expert in valuing life than the average person").

The problem here is not so much whether Dr. Smith reviewed and incorporated facts from D.M.'s medical findings, as it is Dr. Smith's unreliable methodology—which cannot be properly *applied* to the facts in this case, at least not in any meaningful or reproducible manner. Objection One is therefore **OVERRULED**.

### B. Objection Two

Plaintiffs argue that it was error for the Magistrate Judge to recommend that Dr. Smith not be permitted to testify as to his calculation of RVL or the value of D.M.'s parents' loss of his household/family services. Stated differently, Plaintiffs essentially frame the question this way: If the jury may award damages based on RVL and loss of household/family services, why not allow them to hear Dr. Smith's opinion and consider his calculations? After all, he is a qualified expert. What would it hurt?

The Court's ruling above is a sufficient basis alone to overrule Plaintiffs' second objection. But as the Magistrate Judge correctly found, there are other reasons why Dr. Smith's testimony should be excluded. For example, it is generally not the role an expert economist to quantify *noneconomic* damages. Yet here, Plaintiffs are improperly seeking to have Dr. Smith do just that.

To the extent that the loss of enjoyment of one's life is a recoverable damage,[3] it is only compensable as a component part of other recognized forms of noneconomic damage, such as pain, mental anguish, and physical and mental impairments. *First Tr. Co. of N. Dakota v. Scheels Hardware & Sports Shop, Inc.*, 429 N.W.2d 5, 14 (N.D. 1988).

---

[3] North Dakota law does not specifically enumerate that loss or impairment to the value of life is a statutory element of damages. N.D. Cent. Code § 32-03.2-04.

And the North Dakota Supreme Court has long observed that "[t]he determination of [non-economic] damages for pain and suffering is not susceptible of arithmetical calculation. Its ascertainment must to a large degree depend upon the common knowledge, the good sense and practical judgment of the jury." *Lake v. Neubauer*, 87 N.W.2d 888, 891 (N.D. 1958); *see also Slaubaugh v. Slaubaugh*, 466 N.W.2d 573, 577 (N.D. 1991) (noting that the valuation of non-economic damages "rests largely within the sound discretion of the jury"). Dr. Smith appears to agree, inasmuch as he characterizes his valuation opinions as mere "example[s]" that "the jury may consider interesting to review." (Doc. 141-2 ag 36-37).

Dr. Smith's opinions will not assist the jury—and should therefore be excluded under Rule 702—because the law does not consider these types of damages to be beyond the jury's ability to understand and determine on its own. Dr. Smith is no more qualified than anyone else to place a precise dollar value on the loss of the enjoyment of life, or the value of a parent's loss of consortium with her child. In fact, like pain and suffering, the applicable law commits these types of valuations to collective wisdom of the jury. Objection Two is therefore **OVERRULED**.

### C. Objection Three

The third objection goes to the Magistrate Judge's related conclusion that Dr. Smith's proposed testimony would likely confuse the jury. Plaintiffs contend that the Magistrate Judge "invad[ed] the province of the jury" when she unduly relied on and gave greater weight to Defendants' competing expert opinions that sought to discredit Dr. Smith's testimony. Plaintiffs miss the point here. The Magistrate Judge's ruling was not about choosing one side's expert over the other. It was about Rule 403. The Magistrate

Judge observed—as one reason, among many others—that Dr. Smith's opinions on these matters should be excluded because of the likelihood of juror confusion. This Court agrees, especially given its rulings above.

Plaintiffs seek to present the jury with Dr. Smith's statistical models (which do appear mathematical and scientific on the surface), and they will then rely on Dr. Smith's qualifications to imbue his calculations with an illusion of legitimacy. It is certainly not a well-kept secret that such testimony is often used to establish a false anchor for the jury's deliberations—which in and of itself may or may not be a reason for exclusion. But here, for the reasons explained above, Dr. Smith's contested testimony has been deemed unreliable. The Court also harbors concern that the jury would conflate—just as the Plaintiffs do in their briefing[4]—the distinction between proof of economic damages and proof of noneconomic damages. Stated more precisely, there is concern that the jury would lump all of Dr. Smith's monetary opinions together onto the same (economic damages) side of the leger. For these additional reasons, the Court finds there would be a likelihood of substantial juror confusion. Objection Three is therefore **OVERRULED**.

### D. Objection Four

Finally, with regard to the fourth objection, Plaintiffs contend it was error for the Magistrate Judge to conclude that Dr. Smith's calculations were unreliable. For all the reasons previously stated, the Court disagrees. To be clear, Dr. Smith is certainly an expert in the field of economics, but that only unlocks the first tumbler. Likewise, it is true

---

[4] See Plaintiffs' Objections, Doc. 141 at 9. ("Dr. Smith's testimony on RVL and loss of household/family services will help the jury understand the catastrophic impact of D.M.'s injuries on him and his parents in the same way that his testimony on future lost wages and future cost of medical care will help the jury").

13

that some district courts have permitted Dr. Smith's calculation of hedonic damages. But other courts have not, including numerous circuit courts. While there is no binding precedent one way or the other, the Court finds much more persuasive the opinions cited in notes 1 and 2 above.

The Plaintiffs conclude by re-urging their belief that "Dr. Smith's testimony provides the jury a basis for the determination of a significant element of Plaintiffs' damages, instead of relying on seemingly arbitrary suggestions from the attorneys," (Doc. 141 at 13), but this Court believes that Dr. Smith's calculations are no less arbitrary than what Plaintiffs' attorneys might argue in closing. Objection Four is therefore **OVERRULED**.

## IV. CONCLUSION

For the reasons explained herein, Plaintiff's Objections (Doc. 141) are **OVERRULED**. The Court **ADOPTS IN FULL** the Report and Recommendation of the Magistrate Judge (Doc. 136). The Motion to Exclude Certain Testimony of Dr. Stan V. Smith (Doc. 57) filed by Defendants Sanford Clinic North d/b/a Sanford Clinic Jamestown and Sarah Schatz, M.D. ("the Sanford Defendants") and the Motion to Exclude Testimony of Stan V. Smith, Ph.D. (Doc. 60) are both **GRANTED**, and Dr. Smith's testimony on reduction in value of life, loss of society and relationship, and loss of "household/family service" is **EXCLUDED FROM TRIAL**.

**IT IS SO ORDERED** on this 31st day of March, 2019.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE